UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| THE JEWISH HOME FOR THE AGED, INC. | : | CASE NO. _____ (lmw) |
| | : | |
| Debtor. | : | |
| | : | |
| THE JEWISH HOME FOR THE AGED, INC. | : | |
| | : | |
| Movant, | : | |
| VS. | : | |
| | : | |
| STATE OF CONNECTICUT DEPARTMENTS OF | : | |
| SOCIAL SERVICES, REVENUE SERVICES AND | : | |
| LABOR, RSB CITIZENS, NATIONAL | : | |
| ASSOCIATION, THE JEWISH HOME | : | |
| BUILDING FUND CORP., NEW ALLIANCE | : | |
| BANK, GREATER NEW HAVEN WATER | : | |
| POLLUTION CONTROL AUTHORITY, | : | |
| THE MEDICINE CENTRE/SENIOR CARE, LLC, | : | |
| UNITED ILLUMINATING CO., STATE OF | : | |
| CONNECTICUT, ALLIANCE REHAB OF | : | |
| CONNECTICUT, LLC, THE SOUTHERN | : | |
| CONNECTICUT GAS CO., MORRISON | : | |
| MANAGEMENT SPECIALISTS, INC., NEW | : | |
| ENGLAND HEALTH CARE EMPLOYEE | : | |
| PENSION FUND, NEW ENGLAND HEALTH | : | |
| CARE EMPLOYEES WELFARE FUND, NEW | : | |
| ENGLAND HEALTH CARE EMPLOYEES | : | |
| UNION DISTRICT 1199, AND THE | : | |
| CONNECTICUT NURSING HOMES TRAINING | : | |
| AND UPGRADING FUND, | : | |
| | : | |
| Respondents. | : | FEBRUARY 14, 2011 |

**MOTION FOR (I) USE OF PROPERTY OTHER THAN IN THE ORDINARY COURSE OF BUSINESS AND FOR RELATED RELIEF AND (II) USE OF CASH COLLATERAL ON A PRELIMINARY AND FINAL BASIS**

The Jewish Home for The Aged, Inc. ("JHA" or the "Debtor"), the debtor and debtor-in-possession, by and through its attorneys, Zeisler & Zeisler, P.C., hereby moves pursuant to § 363 and 364 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 ("Bankruptcy Code"), for an order of this Court (i) authorizing the Debtor to receive advance payments from the State of Connecticut, Department of Social Services ("DSS"), and to grant the DSS a super-priority administrative expense claim and senior lien solely to the extent (not to exceed $400,000) that any advances authorized by this Order are not recouped against future Medicaid payments, and (ii) authorizing the use of cash collateral and authorizing the Debtor to provide adequate protection to the secured creditors to protect against the diminution of the collateral securing their respective claims and liens. In support thereof, the Debtor respectfully represents as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2

## INTRODUCTION

2. On February 14, 2011, JHA filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its affairs and assets as a debtor-in-possession.

3. JHA, a not for profit organization established in 1914, is a non-sectarian 226 bed skilled and intermediate care nursing facility located at 169 Davenport Avenue, New Haven, Connecticut, with approximately 186 full time residents and more than 40 day clients.

4. JHA provides both long term care and short term rehabilitative services, providing 24-hour skilled nursing care, rehabilitation, hospice care and adult day health services. It has a full time staff of physicians who provide on site medical consultation in podiatry, psychiatry, ophthalmology, dermatology, dental and internal medicine needs.

5. In connection with the services offered, JHA has more than 200 employees and professionals on staff.

6. For the past several years, JHA has experienced significant financial difficulties.

7. These difficulties resulted largely from a gradual decrease in residents in JHA's care, increases in the cost to provide for the health, welfare and care of its residents, and the disparity between such costs and the reimbursements received by JHA from various sources.

3

8. During this time frame, JHA engaged in a variety of measures to address its financial difficulties. Among other avenues, JHA actively pursued the sale of its nursing home facility and the real estate and improvements used for such operations, known as 167 Davenport Avenue a/k/a 169 Davenport Avenue ("JHA's Real Estate"), situated in the City of New Haven, State of Connecticut (collectively, the "Facility").

9. Approximately 6 months ago, an individual expressed a willingness, through an entity he formed (the "Prospective Buyer"), to pay Six Million ($6,000,000) Dollars for the Facility. The Prospective Buyer appeared committed to continuing the operations of the nursing home and its traditions within and dedication to the New Haven community. The Prospective Buyer was also willing to invest a significant amount of money to renovate and improve the Facility. Such improvements would have enhanced the care and welfare of the residents of the nursing home and aid dramatically in its long-term viability.

10. The largest impediment to a sale of the Facility to the Prospective Buyer was the significant amount of debt owed by JHA, and the reality that the proceeds of any sale would be insufficient to pay all the liabilities of JHA.

11. In the following months, JHA attempted to negotiate discounts with its many creditors to enable to the sale of the Facility to the Prospective Buyer to be accomplished free and clear of all creditors' claims.

4

12. Substantial progress was made and the transaction progressed as far as scheduling the closing for February 1, 2011. Upon information and belief, the Prospective Buyer had made the necessary arrangements for licensing and financing, and the Prospective Buyer's lender was ready to fund not only the purchase price, but a line of credit to fund the renovations and operations.

13. Unfortunately, despite JHA's best efforts and the various accommodations that had been reached with numerous creditors of JHA, the accommodations were insufficient to effectuate a closing because the proceeds of the sale could not satisfy the various obligations owed, even as discounted.

14. Despite the failure of the closing to occur, the Prospective Buyer remains ready, willing and able to purchase the Facility, so long as the Facility can be transferred free and clear of all claims and interests.

15. The Debtor has commenced this bankruptcy case in the hopes of facilitating the sale of its Facility to the Prospective Buyer, subject to higher and better offers. Such sale appears to be in the best interest of the Debtor's creditors and other parties-in-interest since it would maximize the value received for the Debtor's primary assets.

16. The sale would also permit the continuation of the nursing home and the critically important care it provides to the Debtor's residents.

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

17.     In the absence of this bankruptcy case and a sale of the Facility, a receiver would be appointed by the Superior Court, State of Connecticut, to control and manage the Debtor's nursing home since the Debtor lacks the financial resources necessary to operate, compensate its employees, provide for the health, care and welfare of its residents, and otherwise meet its obligations.  Considering the extent of the secured debts encumbering JHA's Real Estate, the Debtor believes that a receiver would be unable to effectuate a sale of the Facility.  Thus, a receiver would be forced to relocate the Debtor's residents and wind down and close the nursing home.  The Debtor submits that the closure of the Facility would result in the loss of the value of the nursing home and the diminishment in the value of JHA's Real Estate and possibly risk the well-being of the residents.

### RELIEF REQUESTED

18.     The Debtor seeks this Court's authority to receive certain advances from the DSS. The Debtor further seeks this Court's authority to use these advances—which once advanced would constitute cash collateral as that term is defined by Bankruptcy Code § 363(a) ("Cash Collateral")— and other forms of Cash Collateral it holds and anticipates receiving during this case.

19.     The Debtor lacks sufficient cash resources to make the payments required to be paid immediately and over the course of the months necessary to continue its operations, provide for the

health, care and welfare of its residents and sustain the value of its assets, such that the Debtor may effectuate the sale of its Facility.

### A. The Advance of Medicaid Payments From The State of Connecticut, Department Of Social Services

20. The Debtor's primary source of revenue to operate its business and pay its expenses is the payments made by the DSS to reimburse the Debtor for the medical services, room and board and other compensable costs associated with the Debtor's Medicaid residents ("Medicaid Payments").

21. The Debtor has requested that the DSS advance to the Debtor up to One Million, Four Hundred Thousand ($1,400,000) Dollars (the "DSS Advances") from the Medicaid Payments that would come due in the future, to avoid the adverse impact to the Debtor's business and operations that would occur in the absence of such funding and to facilitate the sale of the Debtor's Facility. Any advance authorized by the Court up to the amount of One Million, Four Hundred Thousand ($1,400,000) Dollars would be requested by the Debtor and released by DSS on an "as needed" basis as determined by the Debtor and the DSS.

22. The DSS has requested that it receive, in exchange for the DSS Advances, a super-priority administrative claim and a senior lien (not to exceed $400,000) against the JHA Real Estate, solely to the extent of the amount of DSS Advances that the DSS is unable to recover through the recoupment of Medicaid Payments due the Debtor. The JHA Real Estate is the

7

subject of, among other things, a mortgage interest held by RBS Citizens, National Association ("Citizens"), which has negotiated in good faith with the Debtor and consented to the relief sought herein subject to the terms of the Order.

23. Bankruptcy Code § 363(b)(1), provides, in part, that "[t]he Trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate … ."

24. Bankruptcy Code § 364(c) provides that, "[i]f the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title."

25. Bankruptcy Code § 364(d) provides that the "court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—(A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on property of the estate on which such senior or equal lien is proposed to be granted."

26. The authority provided by § 364(c) and (d) extends to the Debtor, as debtor-in-possession, pursuant to Bankruptcy Code § 1107(a).

8

27. In consideration for the DSS Advances, DSS has requested that the DSS Advances be subject to certain terms in conditions more fully set forth in the proposed order submitted herewith.

28. In particular, the DSS has requested that the Medicaid Account Debtor (as hereinafter defined) shall have the right to make a reduction or otherwise withhold any Medicaid receivables arising from services provided by the Debtor, through recoupment, setoff under Section 553 of the Bankruptcy Code, or otherwise, on account of any amounts due to the Medicaid Account Debtor, including, but not limited to, the DSS Advances within ninety (90) days of the issuance of such advances, as provided by the Connecticut General Statutes. As used herein, "Medicaid Account Debtor" shall mean any account debtor which is (i) the State of Connecticut acting pursuant to a health plan adopted pursuant to title XIX of the Social Security Act and under State law, including the DSS, or (ii) any agent, carrier, administrator or intermediary of the foregoing.

29. The DSS has also requested that, notwithstanding the grant of authority to the Medicaid Account Debtor to recover through reductions to Medicaid Payments due to the Debtor within ninety (90) days of the issuance of the DSS Advances in this Order, said ninety (90) day periods may be extended by written agreement of the DSS and the Debtor without further order of the Court.

9

30. The DSS has requested to be granted a super-priority administrative expense claim pursuant to 11 U.S.C. §364(c)(1) solely to the extent of the amount of DSS Advances the Medicaid Account Debtor is unable to recover through the recoupment of Medicaid Payments due the Debtor, which administrative expense claim shall have priority over any and all costs and expenses of administration or other priority claims in this Chapter 11 case (including current or future super-priority claims other than claims of the DSS) or any subsequent Chapter 7 case, except to the extent provided otherwise herein.

31. The DSS has also requested to be granted a senior lien ("Senior Lien") pursuant to 11 U.S.C. § 364(d) against all that certain piece and parcel of land and improvements thereon known as 167 Davenport Avenue a/k/a 169 Davenport Avenue, situated in the City of New Haven, State of Connecticut ("JHA's Real Estate"), with priority over all other liens and interests in the JHA's Real Estate (except any real estate taxes due to the City of New Haven), solely to the extent of the amount of DSS Advances that the Medicaid Account Debtor is unable to recover through the recoupment of Medicaid Payments due to the Debtor in an amount not to exceed Four Hundred Thousand ($400,000) Dollars ("DSS Shortfall"). Prior to the enforcement of the Senior Lien or any demand for payment in connection therewith, the DSS shall take all steps necessary to recoup the DSS Advances as expeditiously as commercially practicable first from the Medicaid Payments due to the Debtor. In the event of a sale of JHA's Real Estate, the

10

Debtor shall escrow the amount, if any (and not to exceed $400,000), reasonably estimated by the DSS to constitute the DSS Shortfall. This Court shall have jurisdiction to consider any dispute with respect to the implementation of this paragraph including, but not limited to, the amounts to be escrowed, the DSS' diligence in determining and monetizing the DSS Shortfall, the amount of the DSS Shortfall, and the disbursement of the amounts escrowed. Nothing contained herein shall require any further carve out or constitute consent to any further lien pursuant to 11 U.S.C. § 364(d) or otherwise against JHA's Real Estate, and nothing contained herein shall stay or otherwise restrict enforcement of collection against any additional collateral for Citizens' prepetition indebtedness

32. The following creditors may claim an interest in JHA's Real Estate: Citizens, The Jewish Home Building Fund Corp., New Alliance Bank, Greater New Haven Water Pollution Control Authority, The Medicine Centre/Senior Care, LLC, United Illuminating Co., State of Connecticut, Alliance Rehab of Connecticut, LLC, The Southern Connecticut Gas Co., Morrison Management Specialists, Inc., New England Health Care Employee Pension Fund, New England Health Care Employees Welfare Fund, New England Health Care Employees Union District 1199, and The Connecticut Nursing Homes Training and Upgrading Fund (all collectively referred to as the "RE Lien Holders").

11

33. The Debtor is unable to obtain credit to fund its continued operations from any other source than those detailed herein.

34. The RE Lien Holders are adequately protected because the value of the JHA Real Estate is sustained through the continued operations of the Debtor, and will likely be realized through the prompt sale of the Facility. In the event the Debtor is unable to obtain funding, a receiver would be appointed. This would lead to the wind down and closure of the Facility and the diminishment in the value of the JHA Real Estate, as well as great loss to the local community and the residents of the Debtor.

**B.** **The Use of Cash Collateral**

35. The DSS, the State of Connecticut Department of Revenue Services, the State of Connecticut Department of Labor, Citizens, and New Alliance Bank (each a secured creditor and all collectively referred to as the "Secured Creditors") may claim an interest in the Cash Collateral.

36. The Debtor believes that only the DSS holds an interest in the Medicaid Payments since the amount of unpaid advances made by DSS prior to the Petition Date far exceed the amount of accrued and unpaid Medicaid Payments. The Medicaid Payments constitute the vast majority of the Debtor's revenue. The Debtor further believes that Citizens and New Alliance Bank did not properly perfect their security interest in either the Medicaid Payments or the

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

payments due the Debtor on account of Medicare. The Debtor receives a *de minimus* amount of revenue from private pay residents and other sources.

37. By this motion, the Debtor seeks Court authorization to use the Cash Collateral, both on a preliminary basis in accordance with the amounts set forth in a the budget submitted herewith and appended hereto as <u>Exhibit A</u>, and on a final basis. The final budget will be submitted to the Court at the final hearing on the use of cash collateral.

38. The budget represents the Debtor's request to use such Cash Collateral on a preliminary basis for the period from February 16, 2011 to and including March 5, 2011. The Debtor further seeks the use of Cash Collateral on a final basis for period from February 16, 2011 to and including June 15, 2011.

39. In consideration for the Debtor's use of the Secured Creditors' Cash Collateral and to adequately protect the interests of the Secured Creditors in the event that it is determined by this Court that the Secured Creditors possess valid, duly perfected, non-avoidable and enforceable pre-petition liens in the Debtor's cash and/or other assets, the Debtor proposes that as adequate protection for the Secured Creditors to protect against the diminution in value of the Cash Collateral as a result of expenditures (the "Permitted Expenditures") in each case, the Secured Creditors be granted a replacement and/or substitute lien (the "Adequate Protection Lien"), as provided in Section 361(2) of the Bankruptcy Code, in all post-Petition and/or after-

13

acquired assets of the Debtor (including, but not limited to, the proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code to recover the transfer of Cash Collateral), of the same kind as the assets of the Debtor in which the Secured Creditors had liens on the date of the filing of the petition in the Debtor's bankruptcy case (the "Petition Date"), and having the same validity, extent and priority as the pre-petition lien of the Secured Creditors.

40. The Debtor further proposes that, to the extent the Adequate Protection Lien fails to adequately protect the Secured Creditors for the diminution in the value of their Cash Collateral as a result of the Permitted Expenditures, the Secured Creditors should receive an allowed claim with priority over all administrative claims and expenses as and to the extent provided in Bankruptcy Code section 507(b) of the Bankruptcy Code and subject to the further limitations set forth herein.

41. The proposed Orders also provide that, notwithstanding any provision of the Orders, nothing therein shall be deemed to be an adjudication or a declaration by the Court of the existence, validity, enforceability, subordination or priority of any liens or security interests possessed by any Secured Creditor prior to the Petition Date. The Orders do not provide for cross collateralization. The Orders are without prejudice to any party-in-interest, including the Debtor, in challenging the extent, validity and priority of any liens or security interests of the Secured Creditors.

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE   •   P. O. BOX 3186   •   BRIDGEPORT, CONNECTICUT 06605-0186   •   (203) 368-4234   •   JURIS NO. 69625

42.     Any claim(s), cause(s) of action or recovery from any "avoidance actions" under sections 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code are specifically excluded from the collateral of the Adequate Protection Lien and super-priority administrative claims granted pursuant to the Orders; provided, however, that such exclusion does not apply to the proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code to recover the transfer of Cash Collateral.

43.     The Adequate Protection Lien and the super-priority administrative claims granted pursuant to the Orders shall be subject and subordinate in lien, payment and priority to amounts payable by the Debtor: (i) under section 1930(a)(6) of Title 28 of the United States Code, and (ii) to the allowed professional fees and expenses incurred by the Debtor's bankruptcy attorneys during the Cash Collateral Term up to the maximum amount of $150,000, in the aggregate, due such bankruptcy attorneys (items (i) and (ii) are collectively the "Carve Out"); provided, however, that the Carve Out for the fees and costs incurred by the Debtor's bankruptcy attorneys shall be reduced dollar for dollar by the aggregate amount of payments made to the Debtor's bankruptcy attorneys during the pendency of this case.

44.     Notwithstanding anything to the contrary contained in the Orders, the super-priority administrative expense claim granted to the DSS, pursuant to the Orders shall have priority over the Adequate Protection Lien and any super-priority administrative claim granted to

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

the Secured Creditors pursuant to the Orders, but only as applied to that portion of the revenue of the Debtor payable under the Connecticut Medicaid program; as to all other assets of the Debtor, said liens super-priority administrative claims shall be applied *pari passu*; and it is further

45. Notwithstanding anything to the contrary in the Orders, the set-off and recoupment rights held by the DSS and the State of Connecticut, Department of Revenue Services and Department of Labor, are modified to the extent necessary to permit the Debtor's bankruptcy attorneys to be paid their fees and expenses for services provided during the Cash Collateral Term, up to a maximum of $150,000, in the aggregate, from the property and the assets subject to such set-off and recoupment rights; and it is further

46. Notwithstanding anything to the contrary in the Orders, nothing in the Orders shall impair, modify or affect Medicare's right of recoupment, if any; and it is further

47. Notwithstanding anything contained in the Orders, the Secured Creditors only consent to the Debtor's use of cash collateral as set forth therein up to and including March 5, 2011 on the terms and conditions contained herein, and the Secured Creditors expressly reserve and preserve any and all of their rights to object to the Debtor's use of cash collateral beyond March 5, 2010. The failure of the Secured Creditors to object to the Budget or their consent or agreement to the Budget shall not constitute an admission, nor shall it be deemed an admission, that any such budgeted expenses constitute reasonable, necessary costs and expenses of

16

preserving or disposing of the Secured Creditors' collateral. Notwithstanding anything to the contrary contained therein, this Order is without prejudice to the assertion by the Secured Creditors of any existing rights under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Secured Creditors to (i) request additional adequate protection of its interests, or relief from or modification of the automatic stay extant by virtue of Section 362 of the Bankruptcy Code, (ii) request dismissal of this Chapter 11 case or conversion of this case to a case under Chapter 7 or a receivership under state law, or (iii) object to any budget item. The obligations of the Debtor and the rights, claims, security interests, liens and priorities of the Secured Creditors arising under this Order is in addition to, and not in lieu of or in substitution of, the rights, obligations, claims, security interests, liens and priorities of the Secured Creditors granted pursuant to their prepetition liens or under law. All rights granted herein to the Secured Creditors may be exercised individually or collectively.

48. The proposed Orders provide that the Debtor shall maintain the cash management system that is in form and substance acceptable to and approved by the Secured Creditors.

49. The proposed Orders further provide that the Debtor shall provide regular reporting and financial disclosures reasonably requested by the Secured Creditors and will grant access and cooperate with the Secured Creditors (and any financial advisors, auditors, appraisers

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

and any other consultants engaged from time to time at the direction of the Secured Creditors), in each case along with such supporting information as the Secured Creditors may request.

50. Secured Creditors shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

51. Upon the entry of a final order authorizing the advances and use of Cash Collateral provided herein, the Debtor's ability to invoke the provisions of Bankruptcy Code § 506(c) shall be waived.

52. The terms of the Orders shall be binding upon any examiner or trustee appointed under Chapter 7 of the Bankruptcy Code, or an appointed receiver;

53. The proposed Orders also sets forth "Events of Default" more fully set forth therein, and the consequence in the event such Event of Default occurs

54. The proposed Orders provide that Debtor irrevocably waives any right to seek any amendment, modification or extension of the Orders without the prior written consent of the Secured Creditors, and no such consent shall be implied by any other action, inaction or acquiescence of the Secured Creditors. In the event any or all of the provisions of the Orders are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, such modification, amendment or vacatur shall not affect the validity, perfection, priority, allowability, enforceability or non-avoidability of any advances, payments or use of cash whether

18

previously or hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the Secured Creditors pursuant to the Orders arising prior to the effective date of any such modification, amendment or vacatur of the Orders shall be governed in all respects by the original provisions of the Orders, including entitlement to all rights, remedies, privileges and benefits granted therein.

55. Finally, the proposed Orders provide that the Court has and will retain jurisdiction to enforce the Orders according to their terms.

## CONCLUSION

56. The Debtor's need to receive the advances and use the Cash Collateral is compelling. The Debtor requires the use of the cash for the purpose of paying the expenses arising from the operation of its nursing home to continue to provide for the health, care and welfare of the residents, compensate its employees, and meet its other obligations.

57. The Debtor believes that the entry of an order authorizing the receipt of the DSS Advances and the use of cash collateral as described herein and on the terms and conditions set forth in the proposed Order submitted herewith, will be in the best interest of the bankruptcy estate, its creditors and other parties in interest. Most significantly, such authority will maintain the value of the Facility while the Debtor expeditiously moves toward a sale of the Facility to the Prospective Buyer, subject to higher and better offers. Conversely, in the absence of the DSS

19

Advances and the use of the Cash Collateral, a receiver would have to be appointed to operate the Facility. The Debtor submits that this would almost certainly lead to the relocation of the Debtor's residents, the closure of the Facility, and the significant loss in value of the Debtor's assets.

**WHEREFORE**, the Debtor respectfully requests that this Court enter the proposed order submitted herewith authorizing the Debtor's receipt of advances and the use of cash collateral in accordance with the terms and conditions set forth therein, and to grant the Debtor such further relief as this Court deems just and proper.

Respectfully submitted this 14th day of February, 2011, at Bridgeport, Connecticut.

THE JEWISH HOME FOR THE AGED, INC.,
THE DEBTOR

By:   /s/ Stephen M. Kindseth
      Stephen M. Kindseth (ct11460)
      Elana C. Bloom (ct 16980)
      ZEISLER & ZEISLER, P.C.
      558 Clinton Avenue
      Bridgeport, CT 06605
      Tel. 203-368-4234
      Fax 203-367-9678
      Its attorneys

20

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625