<u>**EXHIBIT 1**</u>

<u>**PURCHASE AGREEMENT**</u>

## JEWISH HOME FOR THE AGED
## NEW HAVEN, CONNECTICUT

## ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## ADVANCED HEALTHCARE PROPERTIES, LLC

## AND

## THE JEWISH HOME FOR THE AGED, INC.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Agreement to Purchase | 2 |
| 2. | Purchase Price; Deposit; Treatment of Liabilities | 5 |
| 3. | Title to Assets | 7 |
| 4. | Representations, Warranties and Undertakings of Seller | 8 |
| 5. | Representations, Warranties and Undertakings of Purchaser | 10 |
| 6. | Covenants | 10 |
| 7. | Closing, Conditions and Related Matters | 12 |
| 8. | Closing Documents | 16 |
| 9. | Seller's Accounts Receivables | 17 |
| 10. | Prorations and Adjustments | 20 |
| 11. | Damage or Destruction to the Real Estate | 21 |
| 12. | Condemnation | 22 |
| 13. | Entire Agreement | 22 |
| 14. | Modifications | 22 |
| 15. | Notices | 22 |
| 16. | Non-Solicitation and Non-Competition | 24 |
| 17. | Governing Law; Merger | 24 |
| 18. | Break Up Fee | 24 |
| 19. | Survival of Representations, Warranties and Covenants | 25 |
| 20. | Miscellaneous | 25 |

### EXHIBITS

| Exhibit A | Legal Description | 27 |
|---|---|---|
| Exhibit B | Schedule of Personal Property and Fixtures (pages 28-1 to 28-62) | 28 |
| Exhibit C | Allocation of Purchase Price | 29 |
| Exhibit D | Permitted Exceptions (page 30-1) | 30 |
| Exhibit E | Employment Contracts | 31 |
| Exhibit F | Schedule of Employees (intentionally deleted) | 32 |
| Exhibit G | Leased Equipment | 33 |
| Exhibit H | Contracts to Which Seller is a Party | 34 |
| Exhibit I | Proposed Order Bidding Procedures (pages 35-1 to 35-12) | 35 |
| Exhibit J | Sale Order (pages 36-1 to 36-22) | 36 |
| Exhibit K | Licenses and Provider Agreements | 37 |

JEWISH HOME FOR THE AGED – NEW HAVEN

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this **"Agreement"**) is made and entered into as of the last date set forth on the signature page hereof (the **"Effective Date"**) by and between **ADVANCED HEALTHCARE PROPERTIES, LLC**, a Connecticut limited liability company (**"Purchaser"**), **ADVANCED NURSING & REHABILITATION CENTER OF NEW HAVEN, LLC** ("**AN&RC**"), a Connecticut limited liability company and **THE JEWISH HOME FOR THE AGED, INC.**, a Connecticut not-for-profit corporation, d/b/a **JEWISH HOME FOR THE AGED** (**"Seller"**).

RECITALS:

A.      Seller is the owner of the parcels of land commonly known as 169 Davenport Avenue, New Haven, Connecticut 06519 (the **"Land"**), consisting of approximately 3.84 acres, together with the buildings and improvements located thereon (said buildings and improvements are hereinafter referred to as the **"Improvements"**) which Improvements include a 226-bed Chronic and Convalescent Nursing Home, commonly known as the JEWISH HOME FOR THE AGED and the duly-certified adult day health center commonly known as the GOODWIN-LEVINE ADULT DAY CENTER (collectively, the **"Facility"**).

B.      Seller is the owner of certain personal property, equipment, fixtures, inventory, intangible property and other assets located thereon or used or useful in connection with the Facility.

C.      Seller is the debtor in the case pending under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 ("**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Connecticut (the "**Court**") styled: In re: The Jewish Home for the Aged, Inc., and bearing the docket number 11-30312 (the "**Case**").

D.      Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Land and Improvements described above, together with all such personal property, equipment, fixtures, inventory, intangible property and other assets used in connection with the operation of the Facility other than equipment that is leased pursuant to a contract or lease and which Purchaser chooses not to acquire.

E.      Purchaser's affiliate, AN&RC will be the Purchaser's tenant and the operator of the 226-bed Chronic and Convalescent Nursing Home and will enter into a management agreement with JHA Healthcare, Inc. for the Goodwin-Levine Adult Day Center. Seller agrees that, for purposes of this Agreement, all warranties, representations, covenants and other undertakings or protections made or granted by the Seller are made or granted, as the case may be, to Purchaser and AN&RC.

**NOW, THEREFORE,** in consideration of the mutual covenants and conditions hereinafter set forth, and the above Recitals which are by this reference incorporated herein, and

other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Agreement to Purchase**.

     a.      **Purchased Assets**.  Seller agrees to sell, convey and assign to Purchaser, and Purchaser agrees to purchase and accept under the terms and conditions and for the purchase price hereinafter set forth, other than the Excluded Assets, the following:

     (i)      The Land and Improvements described in the Recitals above and legally described on **Exhibit A** attached hereto and made a part hereof, together with all right, title and interest of Seller in and to all easements, hereditaments, privileges and appurtenances thereunto belonging, and all right, title and interest of Seller to land, if any, lying in the bed of any street, road or avenue, open or proposed, at the foot of or adjoining the Land, or any part thereof, to the center line of such street, road or avenue, and to the use of all easements, if any, whether of record or not, appurtenant to the Land and the use of all strips, gores and rights-of-way, if any, abutting, adjacent, contiguous to or adjoining such Land without any use restrictions whatsoever, except as may be imposed by the underlying zoning of the Land (hereinafter collectively referred to as the "**Real Estate**");

     (ii)      All personal property, furniture, fixtures, equipment, motor vehicles, computer equipment, computer software, building plans and specifications, and other tangible property and assets, whether enumerated herein or not, whether or not now located on the Land or the Improvements, used directly or indirectly in connection with the operation of the Facility as a Chronic and Convalescent Nursing Home, pursuant to Connecticut law, consisting of 226 beds and a certified adult day health center, together with all inventory and supplies (whether opened or unopened) owned by Seller located at the Facility on the Closing Date, as hereinafter defined, (hereinafter collectively referred to as the "**Personal Property and Fixtures**"), including, but not limited to, the personal property, furniture, fixtures and equipment set forth on the schedule attached hereto as **Exhibit B**; all personal property located in, on or about the Facility, including personal property located within the synagogue of the Facility, whether or not used in conjunction with the prayer services and/or meetings by Jewish residents, with the exception of the sefer torahs; and sufficient food and supplies to satisfy the requirements of the State of Connecticut for the operation of a Chronic and Convalescent Nursing Home consisting of 226 beds and adult day health center; and

     (iii)      All intangible property, whether enumerated herein or not, in which Seller has an interest and is used or useful in connection with the operation of the Facility, including, but not limited to:  (i) all service and maintenance contracts for the benefit thereof of which Purchaser or AN&RC elects at least five (5) days prior to Closing to accept by assignment; (ii) all leases or other rental agreements of equipment or appliances used in connection with the operation of the Improvements of which Purchaser or AN&RC elects at least five days prior to Closing to accept by assignment; (iii) all telephone numbers and telephone listings presently in use at or in connection with the

APA6/13/11                                                                                    2

Facility; (iv) all permits and authorizations, to the extent same are assignable by Seller; (v) true, accurate and complete copies of all books, files and records of the operation of the Facility, including, without limitation, all business, resident, employee, payroll, financial, accounting and billing records; (vi) leasehold improvements; (vii) all third party warranties; (viii) all regulatory and compliance materials; (ix) all licenses, permits, and approvals from governmental entities and other parties relating to the business or businesses and operation of the Facility; (x) goodwill; (xi) all contracts not referred to hereinabove, including the Medicare Provider Agreement, as defined hereinafter but subject to any and all defenses available to Purchaser, its affiliates and/or the Seller, of which Purchaser or any of its affiliates elects at least five days prior to Closing to accept an assignment; and (xii) all resident contracts and other agreements with residents of the Facility, including, without limitation, all guarantees thereof; (all hereinafter collectively referred to as the "**Intangible Property**"). (The Real Estate, Personal Property and Intangible Property, but excluding the Excluded Assets, are herein sometimes collectively referred to as the "**Assets**.")

   b. **As Is/Where Is**. THE ASSETS (AND ANY EQUIPMENT SUBJECT TO ASSUMED LEASES AND/OR CONTRACTS) SHALL BE TRANSFERRED "AS IS" AND "WHERE IS". SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE (EXCEPT AS SET FORTH IN SECTION 4 HEREOF). NO STATUTORY OR OTHER WARRANTIES AS TO THE CONDITION OF THE ASSETS OR THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE ASSETS (OR SUCH EQUIPMENT) SHALL BE IMPLIED, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION OF THE ASSETS (OR SUCH EQUIPMENT) OR THEIR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

   c. **Excluded Assets**. Any provision of this Agreement to the contrary notwithstanding, the following (collectively, the "**Excluded Assets**") shall not be included in the Assets and shall not be sold or assigned by Seller to Purchaser pursuant to this Agreement:

    (i) The minute books, corporate seals and other corporate records of the Seller relating to its organization and existence; provided, however, that after execution of this Agreement, Seller shall, on request by Purchaser, and at Purchaser's cost, provide copies of such books, records and other materials not previously provided to Purchaser;

    (ii) All tax returns of Seller and all tax refunds, credits and similar items relating to any period on or prior to the Closing Date;

    (iii) Seller's cash (with the exception of funds received by the Seller from private-pay residents or third-party payments for residents that are paid in advance for goods and/or services to be provided after the Closing Date, all of which shall be transferred to AN&RC at the Closing Date), and deposits, including, but not limited to, the amount deposited by the Seller with the Department of Labor, State of Connecticut;

(iv)    Seller's bank accounts and accounts with other financial institutions with the exception of all funds deposited in said account that belong to AN&RC and must be paid to AN&RC for room, board and care to residents of the Nursing Home or participants in the adult day health center program after the Closing Date (as defined below);

(v)    Seller's accrued Medicaid reimbursements, Medicare claims, claims on account of private pay residents, and third-party payments for goods and/or services provided to or on account of the Seller's residents prior to the Closing Date;

(vi)    Seller's mortgages, notes payable, Seller's notes and loans receivables, accounts receivables and other receivables;

(vii)    Any rights to recovery pursuant to pending lawsuits;

(viii)    Any and all causes of action or claims of the Seller arising in connection with or relating to events which took place prior to the Closing Date, including those arising under the Bankruptcy Code;

(ix)    Any and all avoidance claims or causes of action arising under the Bankruptcy Code, including, but not limited to, all rights and avoidance claims of Seller arising under Chapter 5 of the Bankruptcy Code;

(x)    Any and all stock, membership, partnership and other interests in incorporated and other business entities;

(xi)    All documents, books and records pertaining to the Excluded Assets;

(xii)    Three (3) sefer torahs owned by the Jewish Home Building Fund Corp. ("Building Fund") provided, however that AN&RC may continue to use these torahs pursuant to a lease to be entered into between AN&RC and the Building Fund for no additional monetary compensation and for so long as AN&RC is the licensed operator of and continues to operate the Chronic and Convalescent Nursing Home but not to exceed six (6) years after the Closing Date;

(xiii)    The plaques, memorials and original painted portraits owned by the by the Building Fund; and

(xiv)    All equipment and personal property subject to the leases set forth in **Exhibit G** appended hereto.

2.      **Purchase Price; Deposit; Treatment of Liabilities**.

      a.      **Purchase Price**.  The purchase price (hereinafter referred to as the **"Purchase Price"**) for the Assets shall be Five Million Six Hundred Fifty Thousand Dollars ($5,650,000.00) allocated among the Land, Improvements, Personal Property and Intangible Property (as hereinafter defined), the allocation of which is set forth on **Exhibit C** attached hereto. The Purchase Price shall be paid as follows:

      (i)      The sum of Five Hundred Thousand Dollars ($500,000.00) shall be tendered by the Purchaser to First American Title Insurance Company, 1401 S. Brentwood Boulevard, Brentwood, Missouri 63144 ("**Escrow Agent**") within three (3) business days after the Effective Date of this Agreement ("**Deposit**").  In accordance with the terms hereof, the Deposit shall be returned to Purchaser or applied toward the Purchase Price at the time of Closing, or otherwise delivered.  The Deposit shall be invested by Escrow Agent in a money market account, as directed by Purchaser, and all interest earned thereon shall be credited to Purchaser; and

      (ii)      The payment of the balance of the Purchase Price in the sum of Five Million One Hundred Fifty Thousand Dollars ($5,150,000.00) plus or minus prorations and adjustments as hereinafter set forth in Section 10, shall be paid by Purchaser to Seller at the time of Closing, in cash or by certified or cashier's check or wire transfer, subject to the Environmental Escrow of Two Hundred Fifty Thousand Dollars ($250,000.00), as hereinafter defined and provided for in Section 6.f.; and

      (iii)      To the extent that the Purchaser or AN&RC is the assignee of any contracts in connection with the purchase of the Assets pursuant to this Agreement, the assumption and/or performance by the Purchaser or AN&RC of all of the obligations under such assigned contracts ("**Assumed Liabilities**"), which Assumed Liabilities shall include the following:

      (a)      Any actual or contingent liability, obligation or monetary exposure related to the Medicare Provider Agreement associated with the transfer of Medicare Provider Agreement to AN&RC pursuant to this Agreement, including, without limitation, the potential future assessment of civil monetary penalties, recoupment rights and other liabilities that could attach to or relate to the Medicare Provider Agreement arising out of the operation of the Facility prior to the Closing Date; and

      (b)      Any actual or contingent liability, obligation or monetary exposure, including those imposed by Bankruptcy Code § 365 such that the Seller may satisfy Bankruptcy Code § 365, arising out of any executory contract or lease assumed by the Seller pursuant to Bankruptcy Code § 365 and assigned by the Seller to the Purchaser or AN&RC in connection with their purchase of the Assets pursuant to this Agreement.

b.   **No Assumption of Seller's Liabilities**.   Except to the extent of the Assumed Liabilities, the Permitted Exceptions and as otherwise provided in the Sale Order (defined below), neither Purchaser, AN&RC, nor any other affiliate of the Purchaser shall be responsible for or shall assume or pay for or otherwise perform, whether under a theory of successor liability or any similar theory or otherwise, and the Assets shall be sold free and clear of, any and all claims against the Seller, other interests, liens, encumbrances, debts, obligations and/or liabilities of the Seller, whether accrued, contingent, known, unknown or otherwise, including, without limitation, the following debts, obligations or liabilities (hereinafter collectively referred to as the **"Seller's Liabilities"**):

(i)   Any debts, obligations or liabilities of Seller, whether absolute, accrued, contingent or otherwise, with respect to federal, state, county, local, or other income, property, payroll or franchise taxes or assessments of any kind whatsoever assessed upon, or related to, the operations of Seller and the Facility, transfer, use or other taxes or assessments of any kind whatsoever assessed upon, related to, the operations of Seller and the Facility arising prior to the Closing Date or related to the sale and transfer of any of the Assets purchased hereunder;

(ii)   Any debts, obligations or liabilities to governmental agencies or other third parties, including, without limitation, fines, penalties, and attorney's fees and expenses, with respect to pending or threatened litigation or administrative actions, federal, state or local, or any contingent claims by third parties, asserted or unasserted, with respect to the operation of the Facility prior to the Closing Date, including, without limitation, any claims relating to pricing, environmental law violations, pollution, health, safety, sanitation, hazardous substances, contaminants, or worker's compensation;

(iii)   Any claim, regardless of when asserted, for injury to person or property, which injury occurred prior to the Closing Date, or any administrative claim or litigation (**"PI Claim"**) asserting a violation of any law, rule or regulation, which violation occurred prior to Closing regardless of when the PI Claim is made or asserted, to the extent it arises out of or is based upon any action or omission to act with respect to the operation of the Facility prior to the date of Closing;

(iv)   Any obligations for payroll, accrued vacation or sick pay or personal time or other paid time off, for medical or health insurance coverage under Section 4980B of the Internal Revenue Code of 1986 (**"COBRA"**), as amended, and as modified by the provisions of the American Recovery and Reinvestment Act of 2009, or for other fringe benefit arrangements (including, without limitation, retirement or deferred compensation plan, savings, incentive, stock option or stock purchase plan, unemployment compensation plan, and/or severance pay, whether under ERISA or otherwise, for any employee, consultant or agent of Seller), and any and all other obligations to any employee of Seller pursuant to any agreement (whether oral or written), by law or otherwise, due to or with respect to any employee of Seller existing or accrued prior to the Closing Date;

(v)     Any fees, costs or expenses of Seller or any other party related to the negotiation or consummation of this Agreement or the transactions contemplated hereby or any other agreement, assignment, instrument or document executed in connection with this Agreement;

(vi)     All mortgages, debts, accounts payable, obligations or liabilities of Seller or assumed by Seller, whether comprising claims against Seller in the Case or otherwise;

(vii)     Any and all liabilities of the Seller accruing prior to the Closing under that certain Lease by and between JHA Health Care, Inc., as tenant, and the Seller, as landlord;

(viii)     Any and all liabilities of the Seller accruing prior to the Closing under that certain Management Agreement by and between JHA Health Care, Inc. and the Seller, as manager;

(ix)     Any actual or contingent liability, obligation or monetary exposure related to the Seller's present Medicaid Provider Agreement (the "Medicaid Provider Agreement") and associated with the transfer of the Medicaid Provider Agreement to AN&RC, including without limitation, the potential future assessment of civil monetary penalties, recoupment rights and other liabilities that could attach to or relate to the Medicaid Provider Agreement arising out of the operation of the Facility prior to the Closing Date, including liability or claim under any theory of successor liability or any similar theory and any liability related to a lawsuit or other proceeding filed against the Seller;

(x)     Any and all existing or future liabilities of Seller under leases or executory contracts except as to those acquired by Purchaser by assignment pursuant to 11 U.S.C. §365, if any.

Neither Purchaser nor AN&RC shall be an adopting or successor employer on any employee benefit plan of the type described in subparagraph (iv) above or otherwise, nor shall Purchaser or any of its affiliates have any liability for premiums, contributions, matches, or other payments of any kind thereunder.

3.     **Title to Assets**.

a.     The conveyance of the Assets from the Seller to the Purchaser contemplated by this Agreement shall be transferred pursuant to the Sale Order (defined below) to Purchaser free and clear of all liens, claims, encumbrances, and other interests with the exception of the Real Estate, which shall be subject to the encumbrances and exceptions to title set forth on **Exhibit D** attached hereto and incorporated herein ("**Permitted Exceptions**"), to the extent provided in the Sale Order.

b.      Purchaser shall provide Seller contemporaneously with the Effective Date
of this Agreement, complete and current searches of all Uniform Commercial Code (**"UCC"**)
Financing Statements filed with the Secretary of State of Connecticut and the Recorder of Deeds,
however denominated, of the municipality in which the Real Estate is located in the name of the
Seller and JHA Healthcare, Inc.  The cost of such UCC searches shall be paid by Purchaser.

4.      **Representations, Warranties and Undertakings of Seller**.

a.      **Representations, Warranties and Undertakings of Seller**.  In order to
induce Purchaser to enter into this Agreement and subject to approval by the Court, the execution
and delivery of this Agreement, which includes all the Exhibits, and the consummation of the
transactions contemplated therein, have been duly authorized by the Seller.  Upon obtaining Court
approval (and on the Effective Date as to those provisions to be performed prior to Court
approval), this Agreement shall constitute a legal, valid and binding obligation of the Seller and
shall be enforceable against the Seller in accordance with its term.  Upon obtaining Court approval,
all persons who executed and delivered this Agreement for and on behalf of the Seller will have
been duly authorized to so execute and deliver this Agreement, and their actions shall bind the
Seller to the performance of the obligations therein.

b.      **Due Organization, Good Standing and Authority**.  Seller is a not-for-
profit corporation duly organized, validly existing and in good standing under the laws of the State
of Connecticut, has full right, power and authority to enter into and perform its obligations under
this Agreement and each of the other agreements, assignments, certificates, instruments and
documents executed, furnished or to be furnished in connection herewith or in any Exhibit hereto
or thereto (collectively, the **"Transaction Documents"**) to which Seller is a party.

c.      **Employment Contracts and Related Matters**.

(i)      Except for those agreements listed on the Schedule of Employment
Contracts attached hereto as **Exhibit E**, there are no employment contracts, union contracts
or commitments pertaining to any employee of the Facility;

(ii)      Except as set forth on **Exhibit E**, all employees of the Facility are
employees at will or otherwise employed such that Seller may lawfully terminate their
employment as of the Closing Date;

(iii)      **Seller's Employees and Notice Covenant**.  Seller covenants and
agrees to serve a copy of the Sale Motion on, inter alia, all persons who were employees of
the Seller at any time from August 1, 2007 until the date of service of the Sale Motion by
mailing such by first class U.S. mail, postage prepaid, to their last known address; and

(iv)      **Seller's Termination of its Employees and Possible Hire by
AN&RC**.  Seller hereby covenants and agrees to terminate, as of the Closing Date, the
employment of all of its employees at the Facility and to pay any and all amounts due to, or
with respect to, its employees through the Closing Date for current wages, salaries and

withholding taxes.  AN&RC may, but shall not be required to offer employment from and after the Closing Date to any of such former employees of the Seller, on such terms and conditions as AN&RC may, in its sole discretion, determine.  Neither Purchaser nor AN&RC assumes any obligations of Seller under any collective bargaining agreement.

     d.    **Leased Equipment**.  Except for those leases set forth on **Exhibit G**, all equipment and personal property used by or useful to Seller in connection with the operation of the Facility is owned by the Seller and the Seller has all right, title and interest thereto.

     e.    **Contracts**.  Attached hereto as **Exhibit H** is a true and complete list of all written and all oral contracts, agreements, commitments, and arrangements (other than leases set forth in **Exhibit G**) to which Seller is a party and which affect the Facility.  True, accurate and complete copies of all such contracts shall be delivered to Purchaser concurrently herewith.

     f.    **Maintain Books and Records**.  Seller has maintained its books, records and documents relating to the operation and business of the Facility including, without limitation, retaining copies of written prescriptions, receipts of purchases of pharmaceutical, patient profiles and billings (whether computer generated or otherwise), and prior physical inventories of pharmaceutical and controlled substances, and made them available for government inspection, as required by applicable federal and Connecticut state law.

     g.    **Excluded Personal Property**.  No Personal Property located in, on or about the Facility and used in connection with the Chronic and Convalescent Nursing Home and/or Adult Day Health Center shall be excluded from the Personal Property that is being acquired by the Purchaser, unless the same is specifically excluded in this Agreement or an exhibit hereto. No stained glass windows or artwork may be removed from the Facility without the express written consent of the Purchaser.  The memorials, plaques and original painted portraits located at the Facility are not owned by the Seller and shall be removed from the Facility by their owner prior to the Closing Date.  The Seller shall ensure that the walls from which the memorials, plaques and original painted portraits were removed will be, prior to the Closing Date, fully repaired and restored in a manner consistent with the remainder of the walls.

     h.    **Operate in Normal Course**.  Despite the pending Case, no changes will be made in the normal operation of the Facility from the Effective Date through Closing, and from and after the date hereof and through the Closing Date, Seller shall operate the Facility in the ordinary course of business, shall maintain the Facility and continue to make ordinary repairs, replacements and maintenance with respect to the Facility, the Improvements and all machinery, air conditioners, equipment, partitions, fixtures and Personal Property, and shall deliver all of the same at Closing in good working condition, except as may otherwise be noted herein.

     i.    **Final Cost Reports**.  Seller shall file all of its Medicaid and Medicare Cost Reports for all time periods through the Closing Date, including final Cost Reports, in a timely manner, all at its sole expense, and shall furnish Purchaser with copies of same.

    5.    **Representations, Warranties and Undertakings of Purchaser**.

a.    **Due Organization, Good Standing and Authority**.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Connecticut.  Purchaser has full limited liability company right, power and authority to enter into and perform its obligations under this Agreement and each of the other Transaction Documents to which Purchaser is a party.  This Agreement and the Transaction Documents to which Purchaser is or shall become a party, have been or will be duly authorized, executed and delivered by Purchaser and this Agreement and the Transaction Documents are or will be the legal, valid and binding obligations of Purchaser, enforceable against Purchaser, in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

b.    **Compliance with Agreements**.  The execution, delivery and performance of this Agreement by Purchaser is not in violation of, will not conflict with, and will not constitute a default under any agreement, to which Purchaser is a party which default could have a material, adverse effect on Purchaser's ability to perform its obligations under the terms of this Agreement.

6.    **Covenants.**

a.    **Access to Information**.  Seller is operating the Facility as "Debtor-in-Possession" and agrees to provide Purchaser with all information necessary to enter into this Agreement and to prepare for the change of ownership and operator.

b.    **Consents**.  Seller and Purchaser shall cooperate to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement.

c.    **Further Assurances**.  Subject to the orders of the Court, each of Seller and Purchaser shall use all commercially reasonable efforts to:  (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

d.    **Use of Name**.  Seller hereby agrees that upon the consummation of the transactions contemplated hereby, Purchaser or its assignee shall have all of Seller's rights to the use of the name "**Goodwin-Levine Adult Day Health Center**" or facsimile thereof in connection with the adult day health center licensed in the name of JHA Health Care, Inc., after Purchaser's assignee shall have obtained the required certification and/or licensing from the Agency on Aging of South Central Connecticut Home Care Program, but not the name "**Jewish Home for the Aged, Inc.**" or "**JHA Health Care, Inc.**" or any facsimiles thereof.

     e.    **Cooperation on Tax Matters**.  To the extent required, Seller and Purchaser shall cooperate with each other and promptly prepare and file notifications with, and request Tax clearances from the Connecticut Department of Revenue Services, so that Purchaser will not be incur any tax liabilities of Seller whatsoever, including, but not limited to any sales tax and/or Resident Daily User Fee accruing prior to the date of Closing.

     f.    **Environmental Escrow**. Purchaser has obtained a Phase I Environmental audit, which revealed the existence of an underground storage tank ("**UST**").  The UST was not registered with the Connecticut Department of Environmental Protection ("**DEP**") and has long exceeded its useful life expectancy.  Although the UST passed a tank tightness test that was recently performed, a copy of which has been provided to both parties, the parties have been advised that there remains a reasonable likelihood that the UST is and has been leaking.  The DEP requires that the UST be removed and that the soil and water under and around the UST be tested for contamination.  At the Closing, Seller shall authorize the Escrow Agent to hold in escrow the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) from the Purchase Price paid by Purchaser, which escrowed funds shall be used, as herein after described ("**Environmental Escrow**").  The parties agree that Purchaser's lender shall, within five (5) business days of the Effective Date, enter into a contract with IVi Environmental, Inc. of White Plains, New York to conduct a limited Phase II solely with respect to the existing UST consisting of borings around the UST and along the pipeline from the UST to the Building ("**Limited Phase II**").  If the results of the testing done for the Phase II reveal the likelihood that the level of contamination of one or more hazardous substances will require remediation or clean up of the site at a cost reasonably estimated to exceed Three Hundred and Fifty Thousand Dollars ($350,000.00), Purchaser may terminate this Agreement by doing so, in writing, not later than five (5) business days after receiving the such results of the limited Phase II testing, provided, however, that the Purchaser must exercise such termination right, if at all, on or before forty-five (45) calendar days after the Effective Date.  In the event that the Purchaser does not timely terminate this Agreement despite the results of the Limited Phase II testing, the parties shall share equally all costs associated with the Limited Phase II, removal of the existing UST and all costs associated with any further soil and/or ground water testing arising from the existing UST, replacement of pipes, the purchase and installation of a new 10,000 gallon UST that complies with all requirements of the DEP, and any remediation or clean up of the site up arising from the existing UST, to the aggregate sum of Five Hundred Thousand Dollars ($500,000.00). Seller's share thereof (i.e., not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00)) shall be paid from the Environmental Escrow.  Purchaser shall be solely liable for any such costs exceeding Five Hundred Thousand Dollars ($500,000.00) in the aggregate.  If any part of the escrowed funds has not been expended or committed after the issuance by the DEP of a closure letter or no further action letter to Purchaser acknowledging that any remediation or clean up has been satisfactorily completed, such remaining sum shall be immediately released to the Seller to be disbursed in accordance with the Sale Order.

     g.    **Continuing Right to Inspect**.  Purchaser shall have the right to inspect the Facility, and the books and records at the Facility during normal business hours of 8:00 a.m. to 5:00 p.m. upon reasonable advanced notice to Seller.

h.   **Continuing Access to Books and Records and Assistance**.  Purchaser and AN&RC shall make all of their books and records (both hard copy and computer-maintained documentation) that directly relate to any services provided by Seller to the residents of the Facility prior to the change of operator reasonably available to the Seller, and Purchaser shall provide copies thereof to Seller of documents not exceeding a reasonable amount at a reasonable copy cost to Seller or excessive copying of documents of more than two hundred fifty (250) may be completed by a third-party service arranged by and paid by the Seller to the extent Seller reasonably deems necessary to fulfill its obligations, including, but not limited to, the preparation of tax returns, the preparation of cost reports, the pursuit of claims and causes of action including avoidance actions, and, in reference to the collection of Seller's accounts receivable, as more fully set forth in Section 9 below.  Purchaser shall further permit reasonable access to key personnel, and allow occasional meetings with such personnel on weekdays only, during normal business hours between the hours of 8 a.m. and 5 p.m., so the Seller may fulfill its obligations upon reasonable advanced notice to AN&RC .  The access to books and records and the assistance required by this Section 6.h. shall not interfere unreasonably with the Purchaser's and AN&RC's on-going operations.  The Seller shall not require offices onsite at the Facility although it may require the Purchaser to provide occasional temporary workspace when reviewing records to fulfill its obligations.  The obligations set forth in this Section 6.h shall survive the Closing for the period of one (1) year from the Closing Date.

i.   AN&RC shall be the Purchaser's tenant and the operator of the Facility.

7.   **Closing, Conditions and Related Matters**.

a.   **Dates**.  Seller shall file with the Court by June 9, 2011, a motion (the "Motion"), naming in its caption, as respondents, all holders of liens, encumbrances and/or other claims or interests of record in or against Seller's real or personal property, all persons or entities that are parties to leases with Seller and all persons previously named in the caption of Seller's cash collateral motion in the Case, seeking an order authorizing and approving the sale of substantially all of the Debtor's assets other than in the ordinary course of business, free and clear of liens, claims, encumbrances and other interests pursuant to Bankruptcy Code §363(b) and (f), authorizing and approving the assumption and assignment of executory contracts, and for related relief (the "**Sale Motion**"), and a motion seeking an order authorizing and approving bidding procedures, the break-up fee, an auction, the form and manner of notice thereof, and related relief (the "**Bidding Procedures Motion**"); the proposed form of Sale Order, as defined hereinafter, shall be annexed to the Motion when filed and when served; the hearing shall be conducted on the Bidding Procedures Motion no later than June 15, 2011; an Order granting the Bidding Procedures Motion ("Bidding Procedures Order")  shall be entered substantially identical to the form of order set forth in **Exhibit I** appended hereto no later than June 21, 2011; notice shall be served on June 21, 2011 and certification shall be filed with the Court, both in full compliance with the Bidding Procedures Order; the hearing on the Sale Motion ("**Sale Hearing**") shall be conducted in accordance with the Bidding Procedures Order no sooner than twenty-one (21) days after notice thereof (unless waived in writing by Purchaser), and an Order granting the Sale Motion ("**Sale Order**") shall be entered substantially identical to the form of order set forth in **Exhibit J** appended hereto no later than July 13, 2011 and shall have become a Final Order no later than July

27, 2011 unless waived by Purchaser. "Final Order" in this Agreement means an order of the Court which is not stayed and from which the time to appeal has expired without an appeal or motion for rehearing, review or reconsideration having been filed or, if any such motion or appeal has been filed, then such motion has been denied, the order has been fully affirmed on appeal or the appeal has been dismissed, as the case may be, and the time for any further such motion or appeal has expired without any such motion or appeal having been filed.

b.   **Closing Date**.  The closing of the transactions contemplated herein (the **"Closing"**) shall take place on July 28, 2011, unless Purchaser shall have notified Seller, in writing, on or before July 26, 2011 that not all conditions precedent to Purchaser's obligations have been satisfied or waived by Purchaser.  In the event that all conditions precedent to Purchaser's obligations shall not have been satisfied or waived by Purchaser on or before July 26, 2011, then the Closing shall occur not sooner than two (2) business days after the date that Purchaser notifies Seller, in writing, that all conditions precedent to Purchaser's obligations have been satisfied or waived, up to and including August 15, 2011, but excluding the period from August 1 thru August 12, 2011.  Notwithstanding the foregoing, Purchaser and Seller retain the right to conduct the Closing earlier than July 28, 2011, or after August 15, 2011, by mutual agreement.

c.   **Conditions Precedent to Seller's Obligations**.  The material failure of Purchaser to satisfy any of the conditions or requirements contained in this subparagraph 7.c. shall entitle Seller, at its option, to immediately terminate this Agreement.  The following shall be conditions precedent to Seller's obligations to close.  Seller shall use any and all reasonable efforts and shall in good faith attempt to satisfy the conditions set forth in this Section 7.c.  All conditions precedent set forth in this Section 7.c. shall be deemed to be conditions for Seller's benefit only and may be waived by Seller, in whole or in part, in Seller's sole and exclusive discretion:

(i)   Purchaser has paid the Purchase Price and any other amounts payable on or before the Closing Date by Purchaser;

(ii)   Purchaser has complied with all other agreements and covenants of Purchaser set forth in the Purchase Agreement that are to be performed on or before the Closing Date;

(iii)   Without negating the provisions of Section 7.b. hereof, the Closing shall have occurred no later than August 15, 2011;

(iv)   The pendency of no proceeding in any forum to enjoin any of the transactions provided for herein, to obtain damages with respect thereto or to obtain a ruling or declaration that consummation of such transactions or operation of the Assets by Purchaser or AN&RC would be a violation of any law, decree or regulation;

(v)   The representations and warranties of Purchaser set forth herein shall be true and accurate as of the Closing Date as if made on the Closing Date; and

(vi)   The Sale Order shall be entered no later than July 13, 2011 and shall have become a Final Order no later than July 27, 2011.

d.   **Conditions Precedent to Purchaser's Obligations**.  The material failure of Seller to satisfy any of the conditions or requirements contained, or referred to, in subparagraphs

APA6/13/11                                                    13

7.a. and 7.b. hereof or the material failure of any condition in this subparagraph 7.d. shall entitle Purchaser, at its option, to immediately terminate this Agreement. If this Agreement is terminated for such reason or for any other reason except material breach by Purchaser, then Purchaser shall be entitled to immediate return of the Deposit without any further order of the Court. The following shall be conditions precedent to Purchaser's obligations to close. Purchaser shall use any and all reasonable efforts and shall in good faith attempt to satisfy the conditions set forth in this Section 7.d. All conditions precedent set forth in this Section 7.d., including the requirement that an order entered at or in connection with the Sale Hearing become a Final Order, shall be deemed to be conditions for Purchaser's benefit only and may be waived by Purchaser, in whole or in part, in Purchaser's sole and exclusive discretion:

> (i)      The issuance to AN&RC, whose application for licensure was filed on or about September 27, 2010, of all requisite final, non-probationary licenses and approvals to operate the Facility as a 226-bed Chronic and Convalescent Nursing Home and the transfer of Medicaid Provider Agreement to AN&RC or the execution by AN&RC of a new Medicaid provider agreement with the State of Connecticut and the transfer of the Medicare Provider Agreement to AN&RC.

> (ii)      Full compliance with the provisions of Section 7.a. and b of this Agreement;

> (iii)      In addition to the conditions set forth in Sections 7.d.(i) and (ii) above, it is a condition precedent to Purchaser's obligation to close that: (1) good and marketable title to the Assets, including the Real Estate, Personal Property and Intangible Property is conveyed or transferred to the Purchaser and/or AN&RC free and clear of all liens and encumbrances, other than the Permitted Exceptions to the title to the Real Estate; (2) the representations and warranties of Seller set forth in this Purchase Agreement are true and accurate as of the Closing Date as if made on the Closing Date; (3) there has been no materially adverse change in the physical condition (except for ordinary wear and tear), operations and/or occupancy of the Facility from the Effective Date through and including the Closing Date; (4) the Facility is in substantial compliance with all levels of participation with the Facility's Provider Agreements; (5) a Lease and Management Agreement by and between JHA Healthcare, Inc. and Purchaser and AN&RC, respectively, shall be in form reasonably acceptable to the Purchaser in conjunction with the operation of the Goodwin-Levine Adult Day Health Center ("**Center**") shall become effective as of the Closing Date, such Management Agreement to provide that all revenues derived from the operation of the Center from the Closing Date shall belong to AN&RC and obligations incurred as a result of the operation of Center from the Closing Date shall be the responsibility of AN&RC, but JHA Healthcare, Inc. shall remain the licensee for the Center per the terms of the Agreement; (6) Seller shall have paid or shall have made arrangements, reasonably satisfactory to the Purchaser, for the payment of all of the Resident Daily User Fees and any other financial obligation(s) due from Seller to the Connecticut Department of Revenue Services ("**DRS**") and, if not due on or before the Closing Date, shall either have escrowed the Resident Daily User Fees from April 1, 2011 through the Closing Date or shall have paid the Resident Daily User Fees accruing for those months to the DRS; (7) Purchaser

APA6/13/11                                                  14

and AN&RC shall have agreed upon the terms of a "Rate Letter" with the State of Connecticut, confirming that neither Purchaser nor AN&RC or any officer, manager, member, employee or other agent of same shall have any liability whatsoever for the repayment of any Medicaid funds advanced to the Seller at any time prior to the Closing, as a result of any audits conducted pre or post-Closing for liabilities arising directly or indirectly from the operation of the nursing home prior to the Closing or for any other liability of Seller relating to or arising from its participation in the Medicaid program; and (8) the Medicare Provider Agreement shall have been duly-assigned to the Purchaser, a copy of which, along with a copy of Seller's current nursing home license and adult day health center certification/license issued to JHA Health Care, Inc. are attached hereto as **Exhibit K**; and

(iv)    Without negating the provisions of Section 7.b. hereof, the Closing shall have occurred no later than August 15, 2011.

(v)    The pendency of no proceeding in any forum to enjoin any of the transactions provided for herein, to obtain damages with respect thereto or to obtain a ruling or declaration that consummation of such transactions or operation of the Assets by Purchaser or Advanced Nursing would be a violation of any law, decree or regulation.

e.    **Failure of Purchaser's Condition**.  In the event of a material failure of a one or more of the conditions precedent set forth in this Section 7 that has not been satisfied or waived by Purchaser on or before August 13, 2011, Purchaser shall give Seller written notice thereof.  For purposes of this Section, notice may be sent by facsimile addressed to Title Company and Seller's counsel identified in Section 15, with a copy to follow by certified mail, return receipt requested, and shall be deemed delivered on the date sent by facsimile.  Upon such material failure of one or more conditions precedent set forth in this Section 7. and written notice thereof from Purchaser to Seller, the Deposit plus interest earned thereon shall be returned to Purchaser and the parties shall thereafter have no further obligations or liabilities hereunder.

f.    **Escrow Closing**.  The closing of the transaction contemplated herein shall take place at the offices of Neubert, Pepe & Monteith, P.C., 195 Church Street, New Haven, Connecticut 06510.  Closing shall be through a deed and money escrow with First American Title Company, using form escrow instructions then in use by the Title Company, modified to reflect the terms and conditions of the transaction contemplated herein.  The parties shall use their best efforts to have the Title Company commit to insure the title of Purchaser upon receipt of all of Purchaser's and Seller's deposits.  Seller shall have no obligation for the payment of any escrow fee or closing fees. This Agreement shall not be merged into any escrow agreement, and the escrow agreement shall always be deemed controlling as between Seller and Purchaser.

g.    **Failure by Purchaser to Close**.  If Purchaser fails to close in material breach of this Agreement, then Seller shall be entitled to retain Purchaser's Deposit as liquidated damages but shall have no other remedy or recourse, it being agreed that Seller's damages in case of Purchaser's material breach of this Agreement would be impossible to ascertain and that the

Deposit constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

8.    **Closing Documents**.

        a.    **To Be Delivered By Seller**.  On the Closing Date, Seller shall deliver the following documents to the Escrow Agent and/or to Purchaser, as applicable:

                (i)    Warranty Deed executed by Seller conveying the Real Estate to Purchaser, subject only to the Permitted Exceptions;

                (ii)    Bill of Sale executed by Seller with full warranties of title conveying the Personal Property to Purchaser; _provided that_ all warranties of merchantability and fitness for a particular purpose may be expressly excluded and may expressly state that the personal property is to be conveyed "AS IS";

                (iii)    General Assignment executed by Seller transferring the Intangible Property to Purchaser or Purchaser's nominee;

                (iv)    ALTA Loan and Extended Form Coverage Owner's Policy Statement, or other Owner's Affidavit required by the Title Company;

                (v)    Assignment of the Medicare Provider Agreement and all other certificates of occupancy, licenses, permits, authorizations, and approvals required by law and issued by all governmental authorities having jurisdiction, if available and to the extent assignable;

                (vi)    Schedule of all Resident Trust Fund Accounts, as required by Connecticut laws and regulations, and the Closeout Report, as hereinafter defined;

                (ix)    Evidence, in form and substance reasonably acceptable to Purchaser, that the members of Seller's Board of Directors have approved the transactions contemplated hereby;

                (x)    Form 1099 identifying Seller's gross proceeds and Seller's tax identification number, as required by the Title Insurer;

                (xi)    Such further instruments and documents as are reasonably necessary, expedient or proper in order to complete the transfer of the Assets to Purchaser;

                (xii)    Such forms as the telephone companies may require for transfer or assignment of telephone numbers and yellow page listings; and

                (xiii)    A Sale Order substantially identical to **Exhibit J** hereto, which, unless waived by Purchaser, has become a Final Order and certification by Seller's counsel

that such counsel served the Sale Motion in full compliance with the Bidding Procedures Order, setting forth the details of such compliance.

All of the documents and instruments to be delivered by Seller hereunder shall be in form and substance reasonably satisfactory to counsel for Purchaser and Seller.

b.  **To Be Delivered By Purchaser**.  On the Closing Date, Purchaser shall deliver the following documents to Escrow Agent or to Seller, as applicable:

(i)  Cash or certified funds in an amount sufficient to meet the balance of Purchaser's financial obligations hereunder;

(ii)  If Purchaser has assigned his rights hereunder, assignee's Articles of Organization, Operating Agreement, Good Standing Certificate, and Resolutions by the Manager(s) of Purchaser's assignee authorizing the transactions contemplated herein; and

(iii)  Such further instruments and documents as are reasonably required by Title Company and that are necessary, expedient or proper in order to complete the transfer of the Assets to Purchaser.

All of the documents and instruments to be delivered by Purchaser hereunder shall be in form and substance reasonably satisfactory to counsel for Seller and Purchaser.

c.  **Joint Deposits**.  On the Closing Date, Purchaser and Seller shall jointly deposit with the Title Company or shall exchange the following:

(i)  IRS Form 8594, Asset Acquisition Statement, or similar document, revealing that portion of the Purchase Price attributed to the Real Estate, in such form and substance, as may be required by Connecticut law; and

(ii)  A Closing Statement.

d.  **Possession**.  Possession of the Facility and the Assets shall be delivered to Purchaser on the Closing Date, including all tangible Personal Property shall be located in, on or about the Facility on the Closing Date, as well as written evidence of the assignment of all the right, title and interest in and to Intangible Property from Seller to Purchaser or AN&RC, as the case may be.

9.  **Seller's Accounts Receivable**.  Notwithstanding any other provision of this Agreement, the Seller shall retain all right, title, and interest in and to any and all unpaid accounts receivables with respect to the Facility which arose based upon goods and/or services provided prior to the Closing Date, including, but not limited to, any accounts receivable arising from rate adjustments which relate to any period prior to the Effective Date, even if such adjustments occur after the Effective Date.  The terms, conditions and obligations set forth in this Section 9 of the Agreement shall survive the Closing.

17

a.   **Medicaid Remittance Advices and Payments**.  All Medicaid remittance advices (singularly, an "RA") shall be reviewed by the Connecticut Department of Social Services ("**DSS**") and prior to remittance of payment pursuant to each RA.  AN&RC shall receive payment for all goods and services provided to residents of the Nursing Home on and following the Closing Date, while payment for all goods and services to residents of the Nursing Home prior to the Closing Date shall be accounted for by DSS and retained pursuant to the order of the Court in the Case as and for repayment for monies advanced to the Seller for the ongoing operation of the Nursing Home.  AN&RC shall have the right to question or contest the accuracy of the allocation of the payments made by DSS pursuant to each RA as between the Seller and AN&RC and the Division of Finance shall provide an explanation or breakdown of such allocations with each RA and payment to AN&RC.  In the event that AN&RC dispute the accuracy of any such allocation, AN&RC shall contact Mr. Andrew Davis at DSS, whose responsibilities include overseeing the accounting of such Medicaid payments between the Seller and the new licensed operator.  The allocation of payments shall be performed by DSS for a period of not more than ten (10) months, unless DSS, at its discretion, elects to do so for a longer period of time.  Further, the right of AN&RC to receive payment for all goods and services provided to residents of the Nursing Home on and after the Closing Date does not waive or in any other manner effect the right of DSS to recoupment, setoff or otherwise to recover for claims or liabilities that arise or are incurred on or after the Closing Date from such payments in accordance with applicable law and the Medicaid Provider Agreement with AN&RC.

b.   **Seller's Detailed Schedule of Accounts Receivable and Billing for Receivables**.  Seller shall furnish the Purchaser with a detailed schedule of its accounts receivable, which shall be calculated to a date not earlier than fourteen (14) days prior to the Effective Date of this Agreement.  On the Closing Date, Seller shall provide the Purchaser with an updated and current schedule of accounts receivable from which the AN&RC shall undertake the task of collecting Seller's receivables that have not been outstanding for more than one hundred and eighty (180) days.  AN&RC shall bill the Seller's accounts receivable in accordance with its own billing practices.

(i)   **Medicare Remittance Advices and Payment**.  AN&RC shall provide Seller and DSS with copies of all Medicare Remittance Advices received by AN&RC, as a result of the assignment or transfer the Medicare Provider Agreement and/or provider number from the Seller to AN&RC.  All payments received for such claims filed for services or goods provided to residents of the Nursing Home prior to the Closing Date shall be tendered to DSS to the attention of Mr. Andrew Davis with copies thereof sent to the Seller, until further notice to AN&RC by order of the Court in the Case.  AN&RC shall prepare Medicare claims for filing; provided, however that all necessary documentation and procedures for properly filing a claim are a part of the resident's chart so that the filing of such claim complies with all applicable federal rules and regulations for the filing of same.  AN&RC's customary checklist for Medicare claims will be used and a claim will only be filed if the filing of such claim is in full compliance therewith.  AN&RC shall in all cases make good faith and reasonable business efforts to file and collect Medicare claims for the Seller.

APA6/13/11                                     18

(ii)    **Private Pay and Private Resources Payments**.    Private pay residents are required to pay in advance for their room, board and nursing care.  Private resources payments for Medicaid and Medicare recipients and social security payments are credited in the month in which such payments are received.  All private pay resident payments received from residents with an outstanding balance due the Seller will first be credited toward the month for which AN&RC is providing services and goods.  Any excess payment for such resident shall be posted against such Seller's account receivable for such resident and shall be paid to the Seller.  Any excess payment for such resident(s) shall be posted against such Seller's account receivable for such resident and paid to the Seller.  On or before the tenth (10th) day of each month, AN&RC shall provide the Seller with a memorandum listing all private pay resident payments and private resources payment received during the preceding month for all private pay residents whose accounts were delinquent on the Closing Date, along with copies of checks received, if pertinent, and any additional backup documentation on such payment any Seller receivables received since the prior week's mailing, by resident, with copies of checks received, if pertinent, and any additional back-up information on the payments;

c.    **Seller's Access to Records and Meetings with AN&RC Personnel**.  Seller shall be permitted reasonable access to AN&RC's billing records.  The word "records" as used herein is intended to include both hard copy and computer-maintained documentation of services, bills and billing activity.  The Seller shall also be permitted by AN&RC occasional meetings with the Purchaser, which shall occur no more frequently than twice per month during the six (6) months immediately after the Closing Date and once per month for each month thereafter to discuss billing records or investigate accounts receivables;

d.    **AN&RC's Medicare Reporting Obligations**.  On or before the last day of each calendar month, AN&RC shall submit copies of each RA received by AN&RC for Medicare claims in that month and shall tender payment for all claims paid for services or goods provided by Seller prior to the Closing Date to DSS.  Neither Purchaser nor AN&RC shall have any obligation to appeal any denial of a claim.  Seller acknowledges that all such denials are reviewed by the Center for Medicare Advocacy ("**CMA**") and that the CMA determines whether or not an appeal of such denial should be taken or perfected.  AN&RC agrees to fully cooperate with the CMA in the event that the CMA notifies AN&RC that it is going to appeal such denial and shall make the resident chart and supporting documents available to a representative of the CMA to review at the Nursing Home;

e.    **Payments Collected by Seller Due AN&RC**.  In the event that the Seller receives any non-Medicaid and non-Medicare payments for receivables properly attributable to services delivered by AN&RC, the Seller shall ensure that these receivables are remitted to the Purchaser within ten (10) business days after the end of the month in which the payments were received, together with copies of supporting documentation, including, if applicable.

f.    **Seller's Medicare Receivables and Payment to the State**.  AN&RC agrees to tender all payments received by AN&RC for such Medicare claims paid for services

and goods provided by the Seller by no later than the last day of the month following the month in which such payment was received. In order to securitize its interest in Medicare receivables pre-dating the Closing Date, AN&RC agrees that the Connecticut Department of Social Services ("**DSS**") may recoup against Medicaid receivables due to AN&RC for any Medicare payments received by the Purchaser for goods and services provided to residents prior to the Closing Date and not paid to DSS by the last day of the month following the month in which such payment was received by AN&RC.

g.    **Misapplied Payments**. In the event the parties mutually determine that any payment hereunder was misapplied by the parties, the party which erroneously received said payment shall remit the same to the other within ten (10) business days after said determination is made;

h.    **Duration of Obligation to Collect Seller's Receivables**. AN&RC shall continue its efforts to collect the Seller's accounts receivable for a period of one (1) year from the Closing Date; provided, however that AN&RC shall remain obligated to pay to Seller any funds received for services and goods provided to residents of the Nursing Home prior to the Closing Date, regardless of the date any such payment is received.

i.    **Collection Fee Due AN&RC**. Seller acknowledges that it lacks the financial resources to hire a billing contractor or collector to bill and collect its outstanding accounts receivable and that neither the Purchaser nor AN&RC has a duty or obligation to collect such receivables. As an accommodation to the Seller, AN&RC has agreed to bill for the Seller's outstanding receivables not older than one hundred eighty (180) days. A fee of five percent (5%) of all such sums collected as a result of the efforts of AN&RC with the exception of the Medicaid and Medicare receivables of the Seller shall be paid to AN&RC and may be withheld from the payments tendered to the Seller, as the case may be, for all non-Medicaid receivables of the Seller collected.

j.    **Monthly Memorandum**. After the expiration of the anniversary of the Closing Date, AN&RC shall continue to provide the Seller with a monthly memorandum listing any Seller receivables received since the prior month, by resident, with copies of checks received, if pertinent, and any additional back-up information on the payments, including remittance advices, attached. The AN&RC shall mail such accounting to the Seller at such address as the Seller may so designate with a copy of Seller's counsel, by the tenth (10th) business day of the month following the month that is the subject of the report, as well as to the Division of Finance of the DSS. The Purchaser or AN&RC may submit a written application to the Court in the Case requesting that its reporting schedule be reduced in frequency or terminated after six months of such monthly reports, based upon greatly reduced activity levels in the Seller's accounts. Any such request shall be served on the Seller and on the Assistant Attorney General representing DSS.

10.    **Prorations and Adjustments**. The following items shall be prorated and/or adjusted as of 11:59 p.m. of the date prior to the Closing Date or otherwise as follows:

   a.  **Taxes**.  To the extent applicable, if applicable at all due to the not-for-profit status of the Seller or otherwise, general real estate taxes, State and County Taxes, special assessments and all other levies and charges against the Property (collectively **"Impositions"**) shall be prorated and/or adjusted in accordance with the Residential Real Estate Recommendations and Closing Customs prepared by the New Haven County by the New Haven County Bar Association.

   b.  **Recording Fees**.  All recording fees with respect to clearing public records of Removable Exceptions, transfer and/or conveyance fees and/or taxes and any other Impositions on the conveyance shall be paid by Seller in cash or certified funds on the Closing Date.

   c.  **Utilities**.  All utility charges through and including the day prior to the Closing Date  shall be prorated and/or adjusted in accordance with the Residential Real Estate Recommendations and Closing Customs prepared by the New Haven County by the New Haven County Bar Association.

   d.  **Resident Trust Fund Accounts**.  On the Closing Date, Seller will deliver to Purchaser all resident deposits and other deposits in the possession of Seller made by or on behalf of public aid residents in the Facility or other privately funded accounts for a resident's personal use (the **"Resident Trust Fund Accounts"**), together with a schedule of all the foregoing prepared in accordance with the minimum standards promulgated by the State of Connecticut, if any.  Any shortfall in the Resident Trust Fund Accounts shall be repaid or replaced by Seller, prior to the execution by the Seller and the new operator, AN&RC of a Resident Trust Fund Closeout Report or similar document and filing same with the appropriate agency of the State of Connecticut on or prior to the Closing Date in compliance with all governmental rules and regulations with respect to the Resident Trust Fund Accounts.  Purchaser shall indemnify Seller from all claims and losses arising on or after the Closing Date out of or in connection with Purchaser's handling of the Resident Trust Fund Accounts delivered to Purchaser.

   e.  **Advance Resident Payments**.  All deposits held by Seller as security for the performance of any obligations of residents under agreements with Seller and advance payments made by residents, if any, or on any resident's behalf, to Seller, shall be a credit allowed to Purchaser against the Purchase Price payable in cash at the Closing to the extent any such advance payments relate to any period on or after the Closing Date and to the extent the Seller does not deliver such funds to the Purchaser at the Closing.  Purchaser agrees to provide the services to any such residents for which it received such a credit to the extent of such credit.

   f.  **Miscellaneous**.  All other matters of prepaid and post paid expenses, credit items and other items customarily prorated upon the transfer of a nursing home shall be prorated between the parties on the Closing Date.

  11.  **Damage or Destruction to the Real Estate**.  In the event that between the Effective Date and the Closing Date, a material portion of the Real Estate is damaged or destroyed by fire or other casualty, Seller shall promptly notify Purchaser thereof and Purchaser may elect to:

a.     Terminate this Agreement without cost, obligation or liability on Purchaser's part, in which event the Deposit together with all interest accrued thereon shall be delivered to Purchaser, and the parties shall, thereafter, have no further obligations or liabilities hereunder, or

b.     Consummate the transaction contemplated hereby, in which event all insurance proceeds payable as a result of such damage or destruction together with the amount of any deductible shall be assigned to and credited to Purchaser on the Closing Date.

Purchaser shall notify Seller of its election within five (5) business days after receipt of notice from Seller of such damage or destruction.  If Purchaser fails to notify Seller of its election within said five (5) business day period, such failure shall constitute an election to terminate this Agreement as aforesaid.  The Closing Date shall be adjusted to allow for such election.  Seller covenants and agrees to keep and maintain in full force and effect through the Closing Date hazard insurance on an "all risk" basis insuring the Assets for their full replacement value.  For purposes of this Section, material damage or destruction shall mean damage or destruction, the cost of which to repair exceeds One Hundred Thousand Dollars ($100,000.00).

12.     **Condemnation**.  In the event that between the Effective Date of this Agreement and the Closing Date any condemnation or eminent domain proceeding is initiated which might result in the taking of a portion of the Real Estate greater than twenty percent (20%) of the total square footage thereof, Seller shall promptly notify Purchaser of such proceeding and Purchaser, in its sole discretion, may elect to terminate this Agreement.  In the event Purchaser elects not to so terminate this Agreement, Seller shall assign to Purchaser on the Closing Date all of its right, title and interest in and to any award pertaining to the Assets made in connection with such condemnation or eminent domain proceedings.  Purchaser shall notify Seller within five (5) business days after its receipt of notice from Seller of such condemnation or eminent domain proceeding whether it elects to exercise its right to terminate.  If Purchaser fails to notify Seller, in writing, of its election within said five (5) business day period, Purchaser shall be deemed to have elected to not to terminate this Agreement.  The Closing Date shall be adjusted to allow for Seller's notice and Purchaser's election or failure to make its election.

13.     **Entire Agreement**.  It is understood and agreed that all understandings and agreements heretofore had between the parties hereto are merged in this Agreement, the exhibits annexed hereto and the instruments and documents referred to herein, which alone fully and completely express their agreements.

14.     **Modifications**.   No modifications, amendment, discharge or change of this Agreement, except as otherwise provided herein, shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, amendment, discharge or change is sought, and, with respect to all material modifications, amendments, discharges or changes of this Agreement, unless approved by the Bankruptcy Court.

15.     **Notices**.  Any and all notices given in connection with this Agreement shall be deemed adequately given only if in writing and addressed to the party for whom such notices are

APA6/13/11                                                                22

intended at the address set forth below.  All notices shall be sent by personal delivery, Federal Express or other overnight messenger service, first class registered or certified mail, postage prepaid, return receipt requested or by facsimile ("**FAX**") to the numbers that appear below the names and addresses below.  A written notice shall be deemed to have been given to the recipient party on the earlier of:  (a) the date it shall be delivered to the address required by this Agreement; (b) the date delivery shall have been refused at the address required by this Agreement; or (c) with respect to fax, when sent provided that verification of transmittal has been received by the Sender. Any and all notices referred to in this Agreement, or which either party desires to give to the other, shall be addressed as follows:

|  |  |
|---|---|
| If to Purchaser: | Mr. Makhlouf Suissa<br>c/o Healthcare Accounting Services, LLC<br>1401 S. Brentwood, Suite 170<br>Brentwood, Missouri  63144<br>Fax No. (314) 963-6312 |
| with a copy to: | Mark S. Rubin, Esq<br>Frankel, Rubin, Bond, Dubin, Siegel & Klein, P.C.<br>231 S. Bemiston, Suite 1111<br>Clayton, Missouri  63105<br>Fax No. (314) 726-5837 |
| and to: | Mark I. Fishman, Esq.<br>Neubert, Pepe & Monteith, P.C.<br>195 Church Street<br>New Haven, Connecticut  06510<br>Fax No. (203) 821-2009 |
| If to Seller: | Jewish Home for the Aged, Inc.<br>169 Davenport Avenue<br>New Haven, Connecticut  06519<br>ATTN:  Beth Goldstein, President<br>Fax No. (203) 787-0071 |
| with a copy to: | Stephen M. Kindseth, Esq.<br>Zeisler & Zeisler<br>558 Clinton Avenue<br>Bridgeport, Connecticut  06605<br>Fax No. (203) 367-9678 |

or such other address or to such other party which any party entitled to receive notice hereunder designates to the others in writing.

APA6/13/11                                                        23

16.     **Non-Solicitation and Non-Competition** .  Seller, covenants and agrees that it will not directly or indirectly, whether alone or through one or more intermediaries or its affiliates (partnership, corporate or otherwise), for a period of three (3) year after the Effective Date of this Agreement:  (i) approach any current employees of the Facility which Purchaser elects to retain for the purpose of inducing such employee to leave the employ of Purchaser; (ii) discourage any present or future employee of the Facility from continuing such employment; or (iii) attempt or initiate any employment discussions with any current employee of the Facility which Purchaser elects to retain or any future employee of the Facility.

The Seller hereby covenants and agrees that for a period of three (3) years from the Closing, the Seller will not directly or indirectly, whether alone or through one or more intermediaries or affiliates, including any other charitable entity from which it derives some or all of its funding own any interest in, manage, or operate a Chronic and Convalescent Nursing Home, as defined in the General Statutes of Connecticut, or any nursing facility (collectively, "**Nursing Home**") within a twenty-five (25) mile radius of the Facility.  The Seller may, however, own five percent (5%) or less of the stock in a publicly-traded entity which does engage in the business of owning or operating a Nursing Home.

In the event of a breach of the provisions of this Section, the parties hereto agree that remedies at law will not be adequate and that Purchaser shall be entitled to preliminary and permanent injunctive relief to prevent a then occurring or an about to occur breach of this Section. In addition to injunctive relief, the Purchaser shall be entitled to pursue any other remedy provided by law.  It is further agreed that in the event of a breach of the terms of this Section, the injured party shall be entitled to recover its reasonable expenses incurred in connection with such breach, including, but not limited to, attorney's fees (whether or not litigation is filed), costs, and litigation expenses.  The provisions of this paragraph 16 shall survive closing.

17.     **Governing Law; Merger**.  The validity, meaning and effect of this Agreement shall be determined in accordance with the laws of the State of Connecticut applicable to contracts made and to be performed in that state.  The obligations of Purchaser and Seller hereunder which by their terms are to be performed after the Closing shall survive the Closing Date and shall not be merged with the deed.

18.     **Break Up Fee**.  If Seller receives an offer from a third party (someone other than the Purchaser) for purchase of some or all of the Assets  (an "**Overbid**"), and such Overbid is subsequently accepted by Seller and approved by the Court, or if the Court confirms a plan of reorganization or liquidation of Seller which is not premised on a sale to Purchaser, then the Purchaser will be entitled to receive from the Seller a flat fee payment (not dependent on amounts actually expended or incurred by Purchaser) in cash or other immediately available good funds in the amount of Three Hundred Thousand Dollars ($300,000.00) (the "**Break-Up Fee**").  The Break-Up Fee shall constitute an administrative expense under Sections 503(b) and 507(a)(2) of the Bankruptcy Code and, if a sale of the Assets is closed to a person or entity other than the Purchaser, shall be paid by the Seller to the Purchaser as a cost of sale concurrently with

and from the proceeds of the closing on the sale of the Assets, notwithstanding any lien or security interest in, on or upon the sale proceeds, without further order of the Court.

19.  **Survival of Representations, Warranties and Covenants**.  The parties agree that the respective representations, warranties and covenants contained in Sections 4, 5 and 6 of this Agreement shall be true and correct as of the Closing Date and shall survive the Closing of the transactions contemplated in this Agreement for a period of three (3) years from the Closing Date.

20.  **Miscellaneous**.

a.  This Agreement may be signed in one or more counterparts, which counterparts when taken together shall be deemed one instrument.  For purposes of negotiating and finalizing this Agreement (including any subsequent amendments thereto), any signed document transmitted by FAX machine shall be treated in all manner and respects as an original document. The signature of any party by FAX shall be considered for these purposes as an original signature. Any such FAX document shall be considered to have the same binding legal effect as an original document.  At the request of either party, any FAX document subject to this Agreement shall be re-executed by both parties in an original form.  The undersigned parties hereby agree that neither shall raise the use of the FAX or the fact that any signature or document was transmitted or communicated through the use of a FAX as a defense to the formation of this Agreement.

c.  The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions thereof.

d.  The singular shall include the plural and the plural the singular, as context allows.

e.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  Purchaser shall have the right to assign this Agreement without notice to or consent of Seller, provided that Makhlouf Suissa shall be a member, stockholder, or partner in the assignee.

f.  This Agreement constitutes the complete, final and exclusive expression of the parties' agreement, and it supersedes all proposals and other communications made between the parties concerning the subject matter hereof.  This Agreement cannot be modified except by written agreement signed by all of the parties hereto.

g.  A waiver of a default of any term of this Agreement shall not be construed as a waiver of any succeeding default or as a waiver of the provision itself.  A party's performance after the other party's default shall not be construed as a waiver of that default.

h.  Nothing in this Agreement is intended to confer on any person, other than the parties hereto and their respective successors and assigns, any right or remedies under or by reason of this Agreement.

APA6/13/11                                          25

i.    All Exhibits attached hereto are hereby incorporated in their entirety, as if set forth herein.

j.    The Purchaser consents to the jurisdiction of the Bankruptcy Court with respect to all matters and disputes arising out of this Agreement including, but not limited to, the Bankruptcy Court's adjudication of such matters and/or disputes.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the dates set forth below.

**"PURCHASER"**                                          **"SELLER"**

**Advanced Healthcare Properties, LLC**        **The Jewish Home for the Aged, Inc.**

By: _____                By: _____
Makhlouf Suissa, Manager                              Beth Goldstein, President
Dated: _6/13/11_____, 2011                        Dated: __6/15_____, 2011

**Advanced Nursing & Rehabilitation
Center of New Haven, LLC**

By: _____
Makhlouf Suissa, Manager
Dated: _6/13/11_____, 2011