**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| THE JEWISH HOME FOR THE AGED, INC., | : | CASE NO. 11-30312(LMW) |
| | : | |
| Debtor. | : | JULY 12, 2011 |
| | : | |

**DEBTOR'S RESPONSE TO THE OBJECTIONS FILED BY UNITED ILLUMINATING COMPANY AND MORRISON MANAGEMENT SPECIALISTS, INC. TO THE DEBTOR'S MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 105(a), 363 AND 365 AND FED. R. BANKR. P. 6004 AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF PROPERTY, (C) THE USE OF THE PROCEEDS OF SUCH SALE TO PAY CERTAIN CLOSING COSTS AND <u>CERTAIN SECURED CREDITORS AND (D) OTHER RELATED RELIEF</u>**

The Jewish Home for the Aged, Inc. ("JHA" or the "Debtor"), debtor and debtor-in-possession, by and through its undersigned counsel, Zeisler & Zeisler, P.C., hereby submits its response to the objections filed by The United Illuminating Company ("UI") and Morrison Management Specialists, Inc. ("MMS") to the Debtor's sale ("Sale") to Advanced Healthcare Properties, LLP. ("AHP") of all of its operating assets ("Assets") free and clear of all liens, claims, interests and encumbrances.

I.      <u>INTRODUCTION</u>

The Debtor's immediate sale of its nursing home facility is essential to avoid its closure, the dislocation of its approximately 194 residents, the loss of approximately 275 union and non-union jobs, and the significant diminishment in the value of the Assets.  The proposed sale to

AHP advances the purposes of bankruptcy by ensuring the continuation of the business in the hands of the buyer, the retention of jobs and services, and the maximization of value for the Debtor's stakeholders.  UI and MMS disregard the fact that, after August 15, 2011, the State of Connecticut, Department of Social Services ("DSS"), will cease providing Medicaid advances, and seek to recoup the outstanding Medicaid advances against the Medicaid payments due the Debtor.  Consequently, after August 15th, the Debtor will lack the funds necessary to operate, compensate its employees, continue to provide for the care of it residents, and otherwise meet its obligations.  Additionally, AHP has the contractual right and is considering walking away from the transaction if it does not close as presently agreed on or before August 15, 2011.  There is simply no time or money available to engage in a plan confirmation process as sought by UI and MMS; the risks and costs associated with further delay are too great.

     The Sale presented to this Court for approval maximizes the value of the Assets.  The Sale is the product of the JHA's efforts to sell the Assets since approximately 2007.  In the years since, JHA retained a broker, marketed its Assets for sale, and received various offers with regard to the Assets.  In some instances, JHA progressed as far as executing an asset purchase agreement.  Each time, however, for a variety of reasons, JHA has been unable to effectuate a sale.  Over this same time frame, the real estate and financial markets have collapsed, and the market for nursing homes has deteriorated dramatically.  Notwithstanding this unfortunate turn of events, AHP has committed to pay $5.65 million in exchange for the Assets.  The Debtor has not received any higher and better offer.  In fact, the Debtor has not receive any other offer.  Thus, there is an articulated business justification and a good business reason to engage in the

proposed transaction pursuant to § 363(b) of the United States Bankruptcy Code, 11 U.S.C. § 101-1532 ("Bankruptcy Code").

Recognizing this, the Official Committee of Unsecured Creditors ("Committee") supports the Sale. RBS Citizens, National Association ("RBS"), the holder of the first mortgage and security interest against the Assets, supports the Sale. First Niagara Bank, N.A., successor in interest to New Alliance Bank ("First Niagara"), holds the second mortgage and security interest against the Assets, and, by the Debtor's best calculation, will receive from the proceeds of the Sale significantly less than its claim in the amount of $472,380.65. Nevertheless, First Niagara supports the Sale. The Debtor anticipates that the lien subsequent to the position held by First Niagara—the mortgage held by The Jewish Home Building Fund, Inc. (the "Building Fund") to secure the amount of $1,406,164.38—will not receive any distribution on account of such mortgage. Yet, the Building Fund also supports the Sale.

The Debtor expects to submit evidence to establish that the purchase price for the Assets would have to increase by approximately $2 million before UI would receive any distribution from the proceeds of the Sale. The purchase price would have to increase by approximately $3.5 million before MMS would receive any distribution. This is entirely implausible.

For these reasons and for the reasons more fully set forth below, this Court should overrule the objections submitted by UI and MMS, grant the Sale Motion and approve the Sale.

II. **STATEMENT OF FACTS**

At the hearing to consider the Sale, the Debtor intends to submit evidence of the following.

3

The Debtor, a not for profit organization established in 1914, is a non-sectarian, 226-bed skilled and intermediate care nursing facility ("Facility") located at 169 Davenport Avenue, New Haven, Connecticut ("JHA Real Estate"). The Debtor provides both long term care and short term rehabilitative services, providing 24-hour skilled nursing care, rehabilitation, hospice care and adult day health services. It has a full time staff of physicians who provide onsite medical consultation in podiatry, psychiatry, ophthalmology, dermatology, dental and internal medicine needs. In connection with the services offered by the Debtor, the Debtor has approximately 275 employees and professionals on staff.

For the past several years, JHA has experienced significant financial difficulties. These difficulties resulted largely from a gradual decrease in the number of residents in JHA's care, increases in the cost to provide for the health, care and welfare of its residents, and the disparity between such costs and the reimbursements received by JHA from various sources. During this time frame, JHA engaged in a variety of measures to address its financial difficulties.

Since at least 2007, JHA has actively pursued the sale of its Assets. In 2007, JHA received an acceptable offer and thereafter extensively negotiated an asset purchase agreement. Ultimately, the buyer decided not to proceed. On or about August 18, 2008, JHA engaged Jones Lang LaSalle to serve as its exclusive and sole agent to arrange a sale of the Assets. Jones Lang LaSalle marketed the Assets for approximately six months. JHA received one offer in January, 2009, but the buyer did not go forward after conducting due diligence. In June, 2009, after having received yet another offer, JHA entered into a Sale and Purchase Agreement. On September 30, 2009, this purchaser also elected to cancel the transaction. JHA received

additional letters of intent in 2009 and 2010 and even drafted another purchase and sale agreement. This interest did not result in a signed contract.

In approximately July of 2010, Makhlouf Suissa ("Suissa") offered to acquire the Assets. On August 23, 2010, Suissa and JHA entered into an Asset Purchase Agreement for JHA to sell the Assets to Suissa. The largest impediment to a sale of the Assets was the significant amount of debt owed by JHA, and the reality that the proceeds of any sale would be insufficient to pay the liabilities of JHA in order to close the sale.

In the following months, JHA attempted to negotiate discounts with its many creditors to enable the sale of the Assets to Suissa to be accomplished free and clear of all creditors' claims. Substantial progress was made and the transaction progressed as far as scheduling the closing for February 1, 2011. Upon information and belief, Suissa had made the necessary arrangements for licensing and financing, and Suissa's lender was ready to fund the purchase price and a line of credit to pay for certain renovations and operational expenses. Unfortunately, despite JHA's best efforts and the various accommodations that had been reached with numerous creditors of JHA, JHA remained unable to effectuate a closing because the proceeds of the sale could not satisfy the various obligations owed, even as discounted. Despite the failure of the closing to occur, Suissa remained ready, willing and able to purchase the Assets, so long as the Assets could be transferred free and clear of all liens, claims, interests and encumbrances.

In the face of JHA's financial difficulties, the most recent failed sale transaction, and the $1.8 million in unpaid Medicaid advances, the DSS was preparing to move in early February, 2011, in the Superior Court, State of Connecticut, for the appointment of a receiver to assume

5

control over the Facility. In response, JHA proposed to file bankruptcy to enable the sale to Suissa to occur. JHA requested that the DSS make additional Medicaid advances to provide JHA with the funds required to operate during the very brief time frame necessary to close. The DSS agreed to provide such Medicaid advances up to $1.4 million to facilitate the sale of the Assets. However, such support was conditioned upon the Debtor closing on the sale in an extremely expeditious fashion in light of the Debtor's ongoing and significant operating losses. The DSS originally consented to the Debtor's receipt of such advances and use of cash collateral through and including June 15, 2011. Thereafter, the DSS agreed to extend this deadline to August 15, 2011.

In reliance upon Suissa's continued interest in acquiring the Assets, and the DSS's agreement to provide additional Medicaid advances, on February 14, 2011, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor hoped to effectuate the sale of its Assets to Suissa, or such other prospective purchaser willing to submit a higher and better offer.

On February 16th, this Court held the preliminary hearing to consider the Debtor's receipt of advances from the DSS and use of cash collateral. The final hearing took place on March 2nd. UI and MMS did not appear at these hearings or object to the relief sought. On March 7th, this Court entered its final order ("Final Order") authorizing the Debtor's receipt of advances from the DSS and use of cash collateral.

The Final Order established a "Challenge Period" in which any party-in-interest, including the Debtor and the Committee, must commence, as appropriate, a contested matter or

6

adversary proceeding raising any objection or challenge to the "Prepetition Obligations" as that term is defined therein. Any "Challenge" had to be filed on or before May 16, 2011. In the absence of a "Challenge," then:

> [A]ll of the Debtor's Stipulations (as that term is defined [in the Final Order]), waivers, releases, affirmations and other stipulations as to the priority, extent, validity, amount and secured status as to Citizen's claims, liens, and interests shall be of full force and effect and forever binding upon the Debtor, the Debtor's bankruptcy estate and all creditors, interest holders, and other parties in interest in this case and any successor bankruptcy cases.

(Final Order at 13.) The "Debtor's Stipulations" included a stipulation as to the principal amount of the debt due RBS.

Immediately after filing bankruptcy, the Debtor's counsel and Suissa's counsel began negotiating the terms of an asset purchase agreement. Suissa also worked toward resolving all outstanding issues with the various state agencies, including finalizing a plan of correction with the Department of Public Health, working out the terms of a rate letter with the DSS, and addressing various environmental issues. Suissa also negotiated the terms of a proposed collective bargaining agreement with New England Health Care Employees Union District 1199 ("Union District 1199") (who represents the union employees employed by the Debtor).

The Committee conducted the due diligence necessary to evaluate the validity, priority and amount of the claims and liens held by RBS and First Niagara in the Assets of the Debtor including the JHA Real Estate. Among other things, the Committee received and reviewed the appropriate loan documents and the Land Records for the City of New Haven. The Committee confirmed the validity, priority, and amount of the claims and liens held by RBS and First

7

Niagara. Accordingly, the Committee did not file any "Challenge" on or before May 16, 2011, nor did any other party-in-interest.

After months of negotiating, Suissa's affiliate, AHP, and the Debtor reached a tentative agreement for the purchase and sale of the Assets, on the terms and conditions set forth in a certain Asset Purchase Agreement ("APA"). AHP initially conditioned its execution of the APA upon the ratification of the proposed collective bargaining agreement between it and Union District 1199. On or about June 8, 2011, the union employees ratified AHP's proposed collective bargaining agreement.

On June 13th and June 15th, AHP and the Debtor, respectively, executed the APA. On June 15th, this Court considered and approved the proposed bidding procedures and related relief with respect to the Debtor's motion to approve the Sale ("Sale Motion"). UI and MMS did not object to the proposed bidding procedures. This Court scheduled an auction for July 11th, and a hearing to consider the Sale Motion for July 13th. The auction was not conducted as no other bids were received.

On June 16, 2011, the Debtor filed a copy of the fully executed APA with this Court. The APA requires that the closing occur on July 28, 2011, if not earlier, but no later than August 15, 2011.

8

### III. ARGUMENT

#### A. There is an Articulated Business Justification and Good Business Reason for Proceeding With the Sale Without Awaiting Final Confirmation of a Plan

##### (i) Legal Principles Governing § 363(b)

Section 363(b) of the Bankruptcy Code authorizes a Chapter 11 debtor-in-possession, upon notice and hearing, to use, sell, or lease estate property outside of the ordinary course of business. 11 U.S.C. § 363(b). The Second Circuit Court of Appeals in Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1066 (2d Cir. 1983), confronted the issue of whether and under what circumstances a major asset of a bankruptcy estate could be sold, pursuant to § 363(b), "out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." In its decision, the Second Circuit sought to strike a balance between a debtor's ability to sell its assets during its bankruptcy case and the right of creditors and other parties-in-interest to receive the benefits and protections of the Chapter 11 plan confirmation process. Id. at 1666-71.

Lionel concluded that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such a disposition under section 363(b)." Id. at 1070. A court authorizing a § 363(b) sale must "expressly find from the evidence presented … a good business reason to grant such application." Id. See also Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992).

9

The Second Circuit then set forth a nonexclusive list of factors to guide the consideration of this issue:

- The proportionate value of the asset to the estate as a whole;
- The amount of elapsed time since the filing;
- The likelihood that a plan of reorganization will be proposed and confirmed in the near future;
- The effect of the proposed disposition on future plans of reorganization;
- The proceeds to be obtained from the disposition vis-à-vis any appraisals of the property;
- Which of the alternatives of use, sale or lease the proposal envisions; and
- Whether the asset is increase or decreasing in value (which factor the Lionel court identified as the most important).

Id. at 1071.  In his decision, In re General Motors Corp., 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009), Judge Gerber suggested that courts consider the following additional factors in appropriate cases:

- Does the estate have the liquidity necessary to survive until confirmation of a plan?;
- Will the sale opportunity still exist as of the time of plan confirmation?;
- If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors?; and
- Is there a material risk that by deferring the sale, the patient will die on the operating table?

All of these factors address the ultimate question that the Second Circuit identified in Lionel:  Is there an "articulated business justification" and a "good business reason" for proceeding with the sale pursuant to § 363(b) without awaiting final confirmation of a plan?

The Second Circuit in Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC), 278 F.3d 452, 466 (2d Cir. 2007) (citing Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983), addressed a related issue: whether the proposed sale constitutes an impermissible "sub rosa plan of reorganization."

10

The idea underlying the prohibition is that "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with the sale of assets." In re Braniff Airways, Inc., 700 F.2d at 940.

As Judge Gonzalez recognized in In re Chrylser, LLC, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009), if "the transaction has 'a proper business justification' which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized." Specifically, a "debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of the sale." Id. (citing Florida Dept. Of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2331 n.2, 171 L. Ed. 2d 203 (2008)). "This strategy is employed, for example, when there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources of funding." 405 B.R. at 96 (citation omitted).

### (ii) Application of Legal Principles to the Facts Presented

The Debtor lacks the financial resources necessary to continue to operate. The Debtor only obtained sufficient funds to operate during this bankruptcy case because the DSS agreed to make certain advances of Medicaid payments to facilitate the sale. The DSS provided approximately $1.4 million in Medicaid advances during this bankruptcy case (and is presently owed almost $2.6 million in unpaid Medicaid advances). Because of the risk to the DSS that such advances will ultimately exceed the accrued and unpaid amount of Medicaid payments and

11

other sources of recovery, the DSS originally set June 15, 2011 as the deadline by which the Sale must occur. Delays resulted in the Debtor being unable to close by this date and the DSS agreed to continue making advances through August 15, 2011, on the terms and conditions set forth in this Court's orders.

As it stands now, the DSS will lose substantial funds on the advances made to date. After August 15th, the DSS will not make any further advances of Medicaid payments to fund the Debtor's ongoing operating shortfalls and will seek to exercise its rights of recoupment for the advances to date from revenue due the facility on or about this date. The DSS's rights of recoupment were preserved in this Court's orders authorizing the advances and the use of cash collateral. Consequently, after August 15th, the Debtor will not possess the funds necessary to operate, compensate its employees, provide for the health, care and welfare of its residents, and otherwise meet its obligations.

Furthermore, the Debtor's administrator has tendered her resignation effective August 22, 2011. Her action is understandable considering that the proposed buyer did not make any arrangements with her for her continued employment after the closing of the Sale. Consequently, the Debtor's administrator obtained other employment to commence on or about August 22, 2011. A licensed administrator is statutorily required for the Debtor to operate a nursing home.

Under these circumstances, in the event the Sale does not occur as provided in the APA, the DSS will be forced to move for the appointment of a receiver to control and manage the Debtor's Facility to protect the health, care and welfare of the Debtor's residents. Considering

the extent of the encumbrances against the Assets, and certain other economic realities, the Debtor submits further that a receiver would be unable to effectuate a sale of the Facility and Assets. Thus, a receiver would be compelled to wind down and close the Debtor's nursing home. This would result in the loss of the Debtor's going concern value. This also would result in the loss of approximately 275 jobs and the disruption of the lives of the Debtor's approximately 194 residents. The State of Connecticut would have to incur the very significant expense of installing a receiver, relocating the residents, and closing the Facility, and an institution that has been caring for some of our communities' neediest individuals for almost one hundred years would be shuttered.

Thus, in addressing the factor the Second Circuit in Lionel identified as "most important," it is clear that the Assets are decreasing in value and, more accurately, will be significantly diminished in the absence of the proposed Sale. As outlined above in the Statement of Facts, the Debtor has attempted to sell the Assets for years and the Sale to AHP is the highest, best, and only offer. The purchase price constitutes fair value and there is no evidence to the contrary. See In re Chrylser, LLC, 405 B.R. at 98 ("the true test of value is the sale process itself").

Regarding the other Lionel factors, although the sale concerns substantially all of the Debtor's operating assets and the Debtor cannot then reorganize and rehabilitate after the Sale, there is no likelihood that a plan of reorganization will be proposed and confirmed in the near future. But there is no reasonable prospect for the Debtor to reorganize and rehabilitate at any time in the future.

13

Turning to the factors suggested by Judge Gerber in In re General Motors Corp., the Debtor lacks the liquidity necessary to survive until confirmation of a plan. Because of this, and because AHP has the right to and has stated that it will seriously consider walking away from the transaction if it does not close in accordance with the APA, it appears all but certain that the sale opportunity will not exist as of the time of some hypothetical plan confirmation in the future. Considering the Debtor's circumstances, it further appears that there will be no other sale opportunity or a stand-alone alternative. To use Judge Gerber's words, the patient will die on the operating table if the Sale is not approved by this Court.

The sale does not constitute a sub rosa plan of reorganization. The Debtor's articulated business justification and good business reason establish the purposes of the Sale at this stage in the Debtor's bankruptcy case. The purpose is not to evade the plan confirmation process. On the contrary, absent the Sale, there would be no business to reorganize. The distribution of the Sale proceeds to certain secured creditors does not render the Sale a sub rosa plan of reorganization. In concluding that the sale proposed in In re Chrysler, LLC was not a sub rosa plan of reorganization, Judge Gonzalez reasoned that the "Debtors are receiving fair value for the assets being sold" and "[n]ot one penny of value of the Debtors' assets is going to anyone other than the First-Lien Lenders." 405 B.R. at 97.

In this case, the Sale proceeds will only be used to pay certain ordinary and essential closing costs (such as conveyance taxes), to fund certain escrows (one required by this Court's cash collateral orders and the other by the APA regarding certain environmental costs), and to pay certain municipal liens (with priority granted by statute) and the secured creditors' claims

14

having first and second priority. Such distribution of proceeds is perfectly consistent with the priority of encumbrances of record. The Debtor, UI and MMS have stipulated to admissibility of the following: (i) the Commitment for Title Insurance attached hereto as **Exhibit A** for the limited purpose of establishing the state of the Land Records for the City of New Haven, as of April 11, 2011, to the extent provided in the Commitment for Title Insurance; and (ii) the UCC Search appended hereto as **Exhibit B** for the limited purpose of establishing the state of the records of the Uniform Commercial Code Division, Secretary of the State for the State of Connecticut, as of February 7, 2011, to the extent reflected in such UCC Search. Furthermore, such distributions and the Sale itself do not dictate the provisions of or constrain parties in exercising their confirmation rights with respect to any subsequent plan of liquidation involving the remaining assets of the Debtor. See In re General Motors Corp., 407 B.R. at 496 (citations omitted).

      The immediate distribution of the proceeds of Sale will enhance the likelihood that First Niagara receives some distribution on account of its $472,380.65 claim. If the undisputed first priority claim held by RBS is not paid at closing and must wait for payment until plan confirmation, the debt due to RBS will continue to accrue interest at default rates, and other fees and charges. In particular, RBS's attorney's fees will continue to be added to its debt. In all likelihood, the delay in payment caused by the time necessary to confirm a plan will so diminish the position of the secured claim held by First Niagara that First Niagara will eventually receive no distribution at all. On the other hand, there is no harm in paying the amounts due to RBS and First Niagara at closing, and no reason to delay such payments.

15

### B. The Debtor May Sell The Assets Free and Clear Of Any Interest Therein Pursuant To Bankruptcy Code §§ 363(f)(3) & (5)

The Debtor may sell the Assets free and clear of UI's and MMS's interest in such property because the Debtor satisfies both subsection (3) and (5) of Bankruptcy Code § 363(f).

As in all cases of statutory construction, where the statute's language is plain, the sole function of the court is to enforce it according to its terms. See States v. Ron Pair Enters., 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) (citation omitted). "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" Id. at 242-43. When statutory language is plain and unambiguous, "the sole function of the courts . . . is to enforce it according to its terms." Lamie v. United States Tr., 540 U.S. 526, 534, 124 S. Ct. 1023; 157 L. Ed. 2d 1024 (2004) (internal quotation marks omitted). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." . Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992). It is for Congress to enact legislation. See , 540 U.S. at 538 ("Our unwillingness to soften the import of Congress' chosen words . . . results from 'deference to the supremacy of the Legislature.'") (quoting States v. Locke, 471 U.S. 84, 95, 105 S. Ct. 1785, 85 L. Ed. 2d 64 (1985)).

Section 363(f)(5) provides that the Debtor "may sell property under subsection (b) … free and clear of any interest in such property of an entity" if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." See 11 U.S.C. § 363(f)(5). This provision is plain and unambiguous. If, theoretically, a legal or equitable

16

proceeding could be employed to compel an interest holder to accept a money satisfaction of such interest, then a debtor may transfer property free and clear of that interest.

Here, such a proceeding exists. Both UI and MMS could be compelled to accept a money satisfaction of their interest in the JHA Real Estate through a foreclosure proceeding under Connecticut law. At the conclusion of the foreclosure, the JHA Real Estate would be transferred free and clear of their interests. See Conn. Gen. Stat. §§ 49-15 (strict foreclosure), 49-16 (foreclosure certificate) & 49-26 (foreclosure by sale). See also Argent Mortg. Co., LLC v. Huertas, 288 Conn. 568, 574-75 (2008) (citing City Lumber Co. of Bridgeport, Inc. v. Murphy, 120 Conn. 16, 25 (1935), for the proposition that, upon foreclosure, all right and interest of subsequent encumbrances are extinguished and the mortgagee is vested with absolute title in and dominion over the property)). If the court ordered a foreclosure sale based on the perceived existence of equity for the benefit of the owner or subsequent encumbrances, UI and MMS would be forced to accept the net proceeds of sale if any is available depending upon their relative priority. See Conn. Gen. Stat. § 49-27.

Thus, the Debtor may sell the Assets free and clear of the interests held by UI and MMS pursuant to § 363(f)(5). See In re Boston Generating, LLC, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) (citations omitted); In re Jolan, Inc., 403 B.R. 866, 470 (Bankr. W.D. Wash. 2009). The Ninth Circuit Bankruptcy Appellate Panel in Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 45-46 (9th Cir. BAP 2008), did not consider the possibility of a non-bankruptcy judicial proceeding to satisfy § 363(f)(5).

17

Alternatively, the Assets may be transferred free and clear of UI's and MMS's interests pursuant § 363(f)(3). Section 363(f)(3) permits the transfer free and clear of an interest in property if "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property." In this instance, the term "aggregate value of all liens" is ambiguous. It could mean the aggregate "value" of all liens in the bankruptcy sense as provided by § 506(a) or it could mean the aggregate dollar amount of all liens.

The Supreme Court recognized in United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988), that statutory construction is a "holistic endeavor." "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear." Id. (citations omitted). In Timbers, the Supreme Court considered whether a secured creditor's "interest in property," within the meaning of § 365(d)(1) includes the secured party's right to immediate foreclosure. Acknowledging the ambiguity, the Supreme Court noted that "[s]ection 362(d)(1) is only one of a series of provisions in the Bankruptcy Code dealing with the rights of secured creditors." Id. The Supreme Court then looked to these other provisions to resolve the ambiguity.

Following this methodology, the meaning of the term "aggregate value of all liens" becomes clear because the "value" of a secured creditor's interest in the Debtor's property (in the bankruptcy sense) is defined by § 506(a) of the Bankruptcy Code. Pursuant to § 506(a), a creditors claim is "a secured claim to the extent of the "value" of such creditor's interest in the

18

estate's interest in such property." 11 U.S.C. § 506(a). Thus, the aggregate value of all liens within the meaning of § 363(f)(3) does not exceed the value of the property they encumber. See In re Boston Generating, LLC, 440 B.R. at 332-33. Had Congress meant the aggregate "amount" of all liens, instead of "value," it could have so written § 363(f)(3). Here, the price at which the Assets are to be sold is greater than the aggregate value of all liens on such property.

> Judge Chapman, in In re Boston Generating, LLC, recognized that:
>
> If section 363(f)(3) and … section 363(f)(5) are read in the manner suggested by the Secured Lien Lenders, it seems unlikely that a Court, under any circumstance, could approve a non-consensual section 363 sale. As both a practical matter and a matter of statutory construction, that cannot be the case. It is hard to imagine that Congress intended to so limit a debtor's power to dispose of encumbered assets, particularly where such disposition otherwise satisfies the requirements of section 363(b).

440 B.R. at 332-33. Section 363(f)(3) and (5) should not be interpreted to confer upon UI and MMS the absolute right to veto the Sale. Section 363(f)(5) should be interpreted in accordance with its plain meaning and § 363(f)(3) should be interpreted in accordance with how the term contained therein is used throughout the Bankruptcy Code. This Court should approve the Sale of the Assets free and clear of the liens held by UI and MMS, pursuant to § 363(f)(3) and (5).

### C. AHP is Not An Insider

The proposed buyer, AHP, is not an "insider" within the meaning of Bankruptcy Code § 101(31) and did not exercise control over the Debtor. The APA is the product of arms length negotiations between AHP and the Debtor. Throughout the negotiation process, AHP has proceeded in good faith. There is no evidence to the contrary.

19

**D. The Debtor Does Not Need To Provide Any Adequate Protection To UI and MMS**

Adequate protection is only required to the extent an interest of value is diminished by its "use, sale or lease." See 11 U.S.C. §§ 361 & 363. UI and MMS have no interest of value in the Assets. See id. § 506(a). Therefore, no adequate protection is required as a condition of the sale of the Assets. Id.

**IV. CONCLUSION**

For the foregoing reasons, the debtor and debtor-in-possession, The Jewish Home for the Aged, Inc., respectfully requests that this Court overrule the objections filed by UI and MMS, and grant the Sale Motion in accordance with the proposed order submitted therewith.

Dated at Bridgeport, Connecticut, this 12th day of July, 2011.

> THE DEBTOR,
> THE JEWISH HOME FOR THE AGED, INC.
>
> By: */s/ Stephen M. Kindseth*
> Stephen M. Kindseth (ct14640)
> Zeisler & Zeisler, P. C.
> 558 Clinton Avenue
> P. O. Box 3186
> Bridgeport, CT  06605-0186
> Tel: (203) 368-4234
> Fax: (203) 367-9678
> Email: skindseth@zeislaw.com
> Its attorneys